**GARDY & NOTIS, LLP**
James S. Notis
jnotis@gardylaw.com
Charles A. Germershausen
cgermershausen@gardylaw.com
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**MILBERG LLP**
Peter Safirstein
psafirstein@milberg.com
Roland Riggs
rriggs@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel: 212-594-5300
Fax: 212-868-1229

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRY SCHUTSKY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SYNCHRONOSS, INC., STEPHEN G. WALDIS and LAWRENCE R. IRVING,<br><br>Defendants. | No. |

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Barry Schutsky ("Plaintiff"), on behalf of himself and others similarly situated,

by his attorneys, hereby alleges the following based upon information and belief, and upon the

investigation by Plaintiff's counsel, which included, among other things, a review of the facts

and circumstances alleged herein, including, without limitation: (a) review and analysis of certain filings made by Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of certain press releases, public statements, news articles, and other publications disseminated by or concerning Defendants herein and related parties; (c) review and analysis of certain Synchronoss press conferences, analyst conference calls and conferences, and the corporate website of Synchronoss; (d) review and analysis of securities analyst reports concerning Synchronoss and its operations; and (e) review and analysis of certain other information, documents, and materials concerning Synchronoss and the other Defendants named herein.

Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Class Action Complaint (the "Complaint") after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.

## ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1

1.      The names and addresses of the parties are as follows:

| **Plaintiff** | **Defendants** |
|---|---|
| Barry Schutsky<br>c/o Milberg LLP<br>One Pennsylvania Plaza, 49th Floor<br>New York, New York 10119 | Synchronoss, Inc.<br>750 Route 202 South, Suite 600<br>Bridgewater, New Jersey 08807 |
| | Stephen G. Waldis<br>750 Route 202 South, Suite 600<br>Bridgewater, New Jersey 08807 |
| | Lawrence R. Irving<br>750 Route 202 South, Suite 600<br>Bridgewater, New Jersey 08807 |

2

## NATURE AND SUMMARY OF THE ACTION

2.      This is a securities fraud class action against Synchronoss and certain of its officers and directors (the "Defendants").  Plaintiff brings this class action on behalf of all persons and entities that purchased or otherwise acquired securities (the "Class") issued by Synchronoss between and including February 4, 2008 through and including June 9, 2008 (the "Class Period").

3.      Defendants defrauded Plaintiff and the other members of the Class by making fraudulent material misrepresentations and omissions regarding Synchronoss's business and operations.  Specifically, Synchronoss materially misrepresented the Company's financial condition and future prospects to Plaintiff, the Company's shareholders, and the investing public.

4.      Synchronoss provides software that allows purchasers to activate cellular phones on wireless networks, notably AT&T's wireless network.  One such device is the Apple iPhone.  Both AT&T and Apple, as well as Synchronoss, profit from the activation of an iPhone on AT&T's network.  By contrast, iPhones that are not activated on Apple's network provide less revenue to Apple and no revenue to either AT&T or Synchronoss.  iPhones which are purchased but not activated on AT&T's network are referred to as "unlocked" iPhones.

5.      Because AT&T accounts for nearly 80% of Synchronoss's revenue, it is critical to the future success of Synchronoss that AT&T continues to use the Company's cell phone activation technology.  Importantly, before and during the Class Period, Defendants failed to disclose to investors numerous warning signs that the unlocking of iPhones jeopardized Synchronoss's "multi-year" iPhone contract with AT&T.

6.      While Apple iPhones were extensively being unlocked for use with other wireless carriers, Synchronoss continued to maintain that it was in great financial shape.  However, on

May 6, 2008, the Company announced that it had "materially lowered" its growth expectations for 2008 due in large part to declining revenue associated with Apple's iPhone.  And on June 10, 2008, the Company announced that its cell phone activation technology would no longer be used with the next generation of Apple's iPhone, scheduled to be released on July 11, 2008.

7.      On May 6, 2008, Synchronoss closed at $22.98.  After the close, the Company revised its outlook for the fiscal year of 2008, reducing revenues below analysts' estimates. Synchronoss explained that it expected iPhone-related revenue to decline $30 million compared to the previous year, but failed to disclose that the reason for the decline was that Synchronoss would not be activating 3G iPhones.  Rather, Synchronoss stated only that "[t]he gap between the number of iPhones expected to be sold and the actual number that we are activating continues to be significant, and we expect this trend to continue."  On May 7, 2008, the day after Synchronoss's announcement, its stock opened at $12.84, 43% less than before the announcement.

8.      As shocking as the May 6 announcement was, it was still incomplete.  Indeed, because of the Defendants' efforts to further obscure the truth during the May 6 call, the stock experienced a slight rebound in anticipation of Apple's new iPhone, the highly touted iPhone 3G. The full extent of Synchronoss's problems was revealed only on June 9, 2008, when AT&T announced Synchronoss would not be activating the iPhone 3G, which was released in July of 2008.  Rather, the iPhone 3G is activated in-store, effectively removing Synchronoss from the transaction altogether.  On this news, Synchronoss stock fell from $13.31 to $11.03, a 17.1% decline.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action because certain of the claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

11.     The Court has personal jurisdiction over Defendants.  In connection with the acts and omissions alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, interstate telephone communications, the mails, and the facilities of the national securities exchanges.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa.  Many of the acts and transactions constituting the violations of law complained of herein, including the dissemination to the public of materially false and misleading statements, occurred in this District.  In addition, Synchronoss maintains its principal executive offices in this Judicial District at 750 Route 202 South, Suite 600, Bridgewater, New Jersey 08807.

## THE PARTIES

13.     Plaintiff Barry Schutsky purchased shares of Synchronoss common stock during the Class Period, as represented in the certification attached hereto, and suffered damages as a result of purchasing said shares at artificially inflated prices.

14.     Defendant Synchronoss is a Delaware corporation with principal executive offices located at 750 Route 202 South, Suite 600, Bridgewater, New Jersey 08807.  Synchronoss is a provider of on-demand multi-channel transaction software management platforms that enable

communications service providers (CSPs) to automate new subscriber activation, order management and service provisioning.  As of August 27, 2008, the Company had approximately 31.4 million shares outstanding that traded on the NASDAQ under the symbol "SNCR."

15.     Defendant Stephen G. Waldis ("Waldis") is co-founder, President, Chairman and Chief Executive Officer of Synchronoss.  Prior to founding Synchronoss, Waldis served as Chief Operating Officer of Vertek Corporation ("Vertek"), a privately-held professional services company serving the telecommunications industry.

16.     Defendant Lawrence R. Irving ("Irving") was, at all relevant times, Chief Financial Officer and Treasurer of Synchronoss.

17.     Defendants Waldis and Irving are collectively referred to as the "Individual Defendants."

18.     Defendant Synchronoss and the Individual Defendants are collectively referred to as "Defendants."

19.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Synchronoss, was privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse effects specified herein had not been disclosed to, and were being concealed from, the investing public.

20.     Each of the Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained within and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Synchronoss, each of the Individual Defendants had access to the adverse undisclosed information about Synchronoss's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about Synchronoss and its business, issued or adopted by the Company materially false and misleading.

21.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Synchronoss securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding Synchronoss's business, operations and management and the intrinsic value of Synchronoss securities; and (ii) caused Plaintiff and other members of the Class to purchase Synchronoss securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or otherwise acquired Synchronoss securities during the period from February 4, 2008 to June 10, 2008, inclusive (the "Class Period") and who were damaged thereby.   Excluded from the class are defendants, the officers and directors of the Company at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Synchronoss's securities were actively traded on the NASDAQ.  As of August 27, 2008, the Company had over 31 million shares of common stock issued and outstanding and traded in the United States.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Synchronoss or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

        b.      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, future prospects and management of Synchronoss; and

c.      the extent to which members of the Class have sustained damages and the proper measure of damages.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS

28.     Synchronoss creates and licenses software used by wireless service providers in a variety of functions, including the activation of wireless devices.

29.     In June of 2007, Apple Computer released its highly anticipated combination music player/mobile-phone known as the iPhone.  Only AT&T and Apple were authorized to sell iPhones.  Assuming they have not been subject to unauthorized modifications, iPhones do not function on any wireless network in the United States other than AT&T's.

30.     As part of its agreement with AT&T, Apple receives a portion of the revenue AT&T generates from the wireless subscription fees of customers who purchase the iPhone.

31.     In July of 2007, Synchronoss trumpeted a "multi-year" contract with AT&T pursuant to which Synchronoss provides software allowing U.S. purchasers of the iPhone to activate that device from their home computers for use on AT&T's network.

32.     Under the contract, Synchronoss was to be paid for each transaction its software effectuates.  If a consumer purchased an iPhone but did not activate it through a personal computer, Synchronoss did not receive any revenue.  For example, if an Apple or AT&T salesperson activated the iPhone in the store, or if for some reason the iPhone was never activated at all, Synchronoss received no revenue.

**The Importance of the iPhone Contract to Synchronoss**

33.     AT&T is by far Synchronoss's single biggest customer.   According to Synchronoss's 10-K for the fiscal year 2007, filed with the SEC February 29, 2008, AT&T accounted for approximately 76% of Synchronoss's 2007 revenues.   The iPhone contract constituted a significant component of that revenue.

34.     The benefits to Synchronoss of the iPhone contract were not limited to the substantial revenue it derived from its initial participation.  The iPhone is a relatively new product; the original iPhone was released just over a year ago, and at the time was unlike any other phone on the market.  Further, most consumer wireless contracts are two years in length. As such, both technical journalists and financial analysts, as well as investors, believe that the number of iPhone sales will increase in coming years.  This belief has allowed Synchronoss to lure investors with the promise of astronomical growth.  This promise became all the more seductive in 2008, becoming a veritable siren song to investors as rumors of the release of a new model iPhone, the iPhone 3G, gained momentum.

35.     For example, in a January 11, 2008 article written in anticipation of Apple's annual MacWorld expo, financial pundit Chris Versace stated that "what is good for the iPhone bodes well for SNCR shares" and that at MacWorld, "[a]ny announcement of a 3G iPhone as well as new software features and functions…bode well for SNCR."

36.    Similarly, in a January 28, 2008 report, Avondale Partners upgraded Synchronoss to "Market Outperform."  In the "Investment Thesis" section of that report, Avondale stated that "the Apple iPhone's release is expected to offer a solid boost to SNCR's transactions."

**The Materially False Statements**

37.    At the open of market trading on February 4, 2008 (the first day of the Class Period), Synchronoss's stock was trading at a price of $23.57 per share.  Later that day, Synchronoss announced its financial results for the fourth quarter and the year ended December 31, 2007.  The Company reported increased earnings for both the fourth quarter and the full year 2007, and Defendants stated in a press release that "we are more optimistic about the Company's long-term future than at any point in our history."  Within this same press release defendant Waldis stated that "we believe Synchronoss is well positioned to benefit from multiple growth opportunities . . . . "

38.    Synchronoss again highlighted the iPhone contract in its February 4, 2008 earnings call.  There, Defendant Waldis stated:

> Let me start with AT&T.  ***During the fourth quarter, our overall relationship with AT&T generated 27.8 million in revenue representing growth of 129% on a year-over-year basis*** and 4% on a sequential basis.  ***For a full year, our AT&T related revenue was 94.5 million which represented growth of 99% on a year-over-year basis.  2007 was truly a milestone year partly reflected in the significant acceleration in the growth and the highest level in history of our relationship with AT&T.***  For 2008, AT&T continues to provide focus and attention to specific growth areas such converged services, data services, growth in mobility, exciting new handsets and their drive into IPTV services and further e-commerce adoption, all providing tremendous opportunities for us for growth and expansion of our platform within the new AT&T.
>
> *            *            *
>
> [W]e are optimistic that we will continue to expand the use of ConvergenceNow platform across AT&T.  Among the transactions that we are automating, ***the fourth quarter was the second full quarter of the Apple iPhone's availability and it was the first holiday season.  We are extremely pleased with the***

*continued high level performance that our ConvergenceNow platform has delivered relative to the activation of the Apple iPhone.  And, as we commented last quarter, automation rates for these transactions are exceeding even our most aggressive expectations at the outset of this relationship.  We are clearly thrilled to be part of the AT&T-Apple relationship* and the high level of acceptance that has been established in such a short period of time is truly amazing.  *The success of the iPhone was one of the factors that led to an overall record in wireless handsets sold by AT&T in its most recent quarter.  We are pleased to be part of this success particularly when you consider the record volumes that are now going through the AT&T e-commerce channel.* (Emphasis added.)

39.      Synchronoss further touted the iPhone contract and its supposed growth potential during the call when Defendant Irving stated that Sychronoss expected a brief decline in revenue growth early in 2008, to be followed by "a sequential up tick of several million dollars in the second quarter *followed by a much stronger second half of the year* as new transactions and customers ramp in addition to *the second half seasonality we expect to see in consumer related wireless transactions.*"  (Emphasis added.)

40.      Analysts responded positively to this outlook.  For example, in a report issued the day after the February 4, 2008 earnings call, Avondale stated that Synchronoss continued to have a "strong growth trajectory", because "the Apple iPhone's release is expected to offer a solid boost to SNCR's transactions."

41.      That same day, ThinkEquity Partners released a report on the company in which its revenue estimates assumed 34% - 35% growth, which it viewed as "well within the capability" of Synchronoss, in part because of Synchronoss's "important ecosystem partner product cycle (the 3G iPhone)."

42.      Needham echoed this sentiment in a February 12, 2008 report, stating that the "iPhone will continue to be [an] important growth driver[]."  Needham also noted in that same

report that "[t]he benefit of being integrated into iTunes is clear in terms of reputation and a working relationship with Apple."

43.     On April 21, 2008, Avondale noted the upcoming earnings calls of both AT&T and Apple, and stated that those calls would be important for Synchronoss's near-term outlook, because "the Apple iPhone is a fairly important source of growth" and the Apple call "gives Apple an opportunity to comment on the 3G iPhone launch, which could provide a boost to sales."

**The Unlocking Phenomenon**

44.     Not all consumers who purchased an iPhone activated it using Synchronoss's software.  Rather, some purchasers of the iPhone modified either the hardware or software to allow the device to function on a network other than AT&T's.  This practice was known as "unlocking" or "jailbreaking."

45.     Although it is not unique to iPhones, unlocking is particularly suited to that device because the iPhone is activated from home, at the user's computer, rather than in the store.

46.     Because unlocked iPhones are not activated on AT&T's network, neither Synchronoss nor AT&T receives revenue from such unlocked iPhones.  Similarly, although Apple receives revenue from the sale of the iPhone, it does not receive that portion of the revenue it would have derived pursuant to its agreement with AT&T to share the revenue generated from iPhone users' wireless service agreements.

47.     Although the investing public was generally aware of the practice of unlocking, the number of iPhones which were actually unlocked was, and remains, impossible for investors to quantify.  Apple reports the number of iPhones it has sold in any quarter, and AT&T reports the number of phones activated on its network.  However, the gap between these two numbers

does not necessarily represent the number of iPhones unlocked, because Apple reports iPhones as "sold" once they are shipped to retailers, and because some iPhones are activated on carriers approved by Apple overseas.

48.     Similarly, Synchronoss has never disclosed to investors how many iPhones it has activated in any period.   Indeed, despite the importance of the AT&T contract as a whole, Synchronoss does not separately disclose its revenue from that or any other contract.   Rather, citing non-disclosure agreements with its customers, Synchronoss informs investors only of its total revenue from operations for each quarter.   Therefore, at no point have investors ever been able to determine for themselves the number of iPhones which have been unlocked in any given quarter.

**The Truth is Partially Revealed**

49.     After the market closed on May 6, 2008, Synchronoss released its quarterly earnings report for the first quarter of 2008, announced a $25 million stock buy-back program, and "materially adjusted" its earnings outlook for the year 2008.

50.     These "material adjustments" included a $30 million reduction in forecasted revenue related to the iPhone.   Defendants claimed that Synchronoss would still realize an "annual run rate" of approximately $10 million in iPhone related transactions.

51.     At the time of the May 6 call, all Defendants knew that Synchronoss would not be involved in the activation process of Apple's new 3G iPhone, set to be launched July 11, 2008. Further, because the older version of the iPhone was no longer to be sold after the 3G launched, Synchronoss would not be involved in the activation of *any* iPhones after July 11.  This, too, was known to all Defendants by the time of the May 6 call.  Indeed, Defendants admitted as much in a form 8-K filed with the SEC June 10, 2008.  That document reads, in relevant part:

After the market close on June 9, 2008, AT&T announced the expansion of its relationship with Apple relative to the much anticipated launch of the 3G Apple iPhone.  Synchronoss will continue our relationship with AT&T as it relates to the activation and provisioning of Apple iPhones.  However, *Synchronoss will not participate in the on-site, retail store activations associated with the 3G iPhone, which was already taken into consideration when we provided our revised financial outlook on our first quarter 2008 financial results conference call.* (Emphasis added.)

52.     Because its involvement in the activation of the 3G iPhone had been terminated, Synchronoss's much ballyhooed growth opportunities related to that device were extinguished. Thus, the damage to its business and the relevance to investors was not simply that Synchronoss would not recognize iPhone related revenue in any particular quarter or year, but rather that its working relationship with Apple, and its related long term prospects, had been destroyed.

53.     Rather than disclose this materially adverse development in their business, Defendants sought to achieve a "soft landing" by reducing revenue guidance but blaming other factors, including the fact that one-time "test transactions" would not recur, the fact that the price per transaction related to the iPhone had lowered as the process became more automated, and the unlocking phenomenon described above.  True to form, Defendants sought to use non-disclosure agreements with AT&T to obscure the real reasons for, and significance of, the reduced iPhone revenue.

54.     Specifically, on the May 6 call, Defendant Waldis stated:

From a summary perspective, our participation in the launch of the iPhone has had a significant impact on our business both financially and even more so from a fundamental perspective.  And while we are not permitted to quantify the impact at that time, *last year, we repeatedly discussed the fact that we generated material revenue from test transactions as AT&T and Apple prepared for this very successful launch.*

In addition to the fact that these tests transactions did not recur in 2008, there are additional factors that have impacted our iPhone related revenue in 2008.  First, as we discussed on our last call, *we initially received a much higher than normal price per transaction as a result of the highest priority being placed on ensuring*

*the success of this major launch. And during the middle of the first quarter of 2008, the price per transaction was brought in line with all of our other activation related transaction pricing.*

Secondly, we cannot share the specifics due to NDA obligations, but *the gap between the number of iPhones expected to be sold and the actual number that we are activating continues to be significant and we expect this trend to continue.* As a reminder, Synchronoss is not paid on the number of iPhones that are sold, but rather than number that we activate. And *as a result, we are materially adjusting our expectations as it relates to revenue related to the iPhone during 2008.*

To put these factors into perspective, we currently expect our related transaction revenue from the iPhone to decline by approximately $30 million in 2008 compared to 2007. *We continue to expect to exit 2008 with an iPhone contribution rate that is in excess of $10 million annually.* Even more important, the decline in our iPhone related revenue is masking the underlying growth and momentum of the rest of our business. (Emphasis added.)

55.     Each of these statements was false and misleading because it failed to reveal that the true reason Synchronoss had reduced its revenue outlook was the fact that it would not be activating iPhones after July 11, 2008.

56.     The deceptiveness of the statements described above is aptly highlighted by the question and answer portion of the May 6 call, in which Defendant Irving -- when asked directly about the future of iPhone transactions -- again sought to use non-disclosure agreements and red herrings to obscure the truth. Specifically, the following exchange occurred between Defendant Irving and Thomas Weisel analyst Tom Roderick:

**Q – Tom Roderick:** Good, thank you. So, Larry, just on your guidance here in terms of the discussion of the iPhone related revenues dropping by 30 million. I guess my first reaction that's a little surprise, that there is 30 million to drop. So, in that regard can you -- *a fairly direct question and if you can answer it would be tremendously helpful for us. Can you confirm that you will continue processing iPhone transactions later in this year and that the guide down strictly related to the number of phones being unlocked and the reduced pricing arrangement around that?*

**A – Lawrence Irving:** I mean, I think the best way to answering that Tom is that -- I try to provide as much information as I could without violating any NDAs that

we have with our customer.  With that being said, to answer your last question -- later part of your question, ***I think Steve kind of brought it out in his prepared remarks in a sense that we expect to see a run rate of somewhere in the neighborhood of about $10 million for the iPhone related revenue coming out of the year.  So, I believe that in itself answers the question that you are asking.***

**Q – Tom Roderick:** Okay.  Okay, that's helpful.  And then again maybe just building on Liz's question with respect to gross margins, the notion that this is a very highly automated transaction type for you.  ***It would seem like if in fact some of the -- some of the unlocking assumptions come in a little conservative, is there a swing factor by which those gross margins could come in higher*** or is it just mostly related to the increased investment ramp around Sprint and other newer customers?

**A – Lawrence Irving:** No -- a good question Tom.  What I tried to say in the prepared remarks is, ***it's really a combination of the both.  So it is the initial investment that we are making in a lot of these new businesses and the mix change as it relates to the iPhone, which is a very highly automated transaction as those transactions are lower than we initially anticipate -- anticipated that has a kind of an impact on our overall gross margins as the year progresses.*** (Emphasis added.)

57.     Like Defendant Waldis's statements, each of these statements was materially false and misleading because, far from being in any way related to "unlocking assumptions" or per transaction prices being "lower than…initially anticipated", the reason for the guidance reduction was that Synchronoss would not be activating *any* iPhones after July 11, 2008.

58.     The market price of Synchronoss dropped from $22.90 to $13.04 following this call.  However, investors still had reason to believe that Synchronoss had growth prospects related to the iPhone, because of its "multi-year contract" regarding that device.  Thus, the Defendants' misrepresentations not only obscured the reason for the damage, but also its true extent.

59.     The efficacy of the Defendants' deception can be seen in analyst reports regarding the May call.  For example, Collins Stewart reported the next day that "Management reduced

iPhone related revenue by $30 million in 2008 ***due to the significant discrepancy between the number of iPhones sold and the number that SNCR activated***."  (Emphasis added.)

60.     Similarly, Deutsche Bank reported that same day that the "Company attributed the slowdown to a combination of lower than expected iPhone activations and smaller revenue ramp from new customers" and stated that this was a "minor disappointment relative to what SNCR expected", but that nonetheless, Deutsche Bank "believe[d] ***SNCR will continue to activate the new phone when it launches*** and estimate[d] a revenue upside up to $15m and EPS upside of $0.20" (emphasis added).

61.     In a May 14, 2008 report, Avondale Partners stated that it "continue[d] to believe that SNCR has a strong opportunity ahead of it to ride growth in communications services and e-commerce."  Indeed, Avondale even listed as a "Potential Catalyst" the "Launch of 3G Apple iPhone/iPhone Subsidies", explaining that "While it has not yet been announced, it is widely anticipated that Apple will launch a new, 3G version of its iPhone in the June/July 2008 timeframe.  At the same time, rumors have circulated that AT&T may apply a $200 subsidy to the iPhone…***Either of these could boost sales of the iPhone, leading to upside for SNCR***."  (Emphasis added.)

62.     On June 4, 2008, Brean Murray Carret & Co. initiated coverage of Synchronoss with a "Buy" recommendation, stating that "quarterly revenue and EPS in 3Q08 and beyond ***will benefit from stabilization of iPhone activations***…"  (Emphasis added.)

63.     On June 9, Brean Murray reiterated this sentiment, adding that "multiple industry sources are predicting the launch of the new Apple 3G iPhone within the next few weeks.  We believe the launch will be a positive event for Synchronoss, as ***we believe the launch will benefit***

*sales with Synchronoss continuing to be the activation vehicle for iPhones utilizing AT&T services*." (Emphasis added.)

64.     As the impending release of a 3G iPhone became closer to realization, the investment community, still deceived by Defendants' failure to disclose the extent of Synchronoss's problems, continued to believe that the iPhone presented Synchronoss with unparalleled growth opportunities, and responded accordingly.  Indeed, Synchronoss shares actually regained some of the ground they had lost after the Defendants' incomplete May 6 announcement, closing on June 9 at $13.31.  This resurgence, however, was the result of false and misleading statements.

**The Truth is Ultimately Revealed**

65.     After the market closed on June 9, 2008, AT&T and Apple announced that all 3G iPhones would be activated in stores by AT&T employees, thus obviating the need for Synchronoss's software.  Synchronoss stock opened the next day at $12.50 and closed at $11.03 on a trading volume of 6,792,127 shares, versus an average daily volume during the class period of 1,348,029 shares.

66.     On June 10, 2008, Synchronoss filed a form 8-K with the SEC confirming this news.  The form 8-K read:

> After the market close on June 9, 2008, AT&T announced the expansion of its relationship with Apple relative to the much anticipated launch of the 3G Apple iPhone. Synchronoss will continue our relationship with AT&T as it relates to the activation and provisioning of Apple iPhones.  However, ***Synchronoss will not participate in the on-site, retail store activations associated with the 3G iPhone, which was already taken into consideration when we provided our revised financial outlook on our first quarter [May 6] 2008 financial results conference call.***  (Emphasis added.)

67.     The 8-K was signed by Defendant Waldis.

68.     Since the June 9 announcement by AT&T, Synchronoss's stock has continued to decline, closing as low as $8.18 on July 3, 2008.

## ADDITIONAL SCIENTER ALLEGATIONS

69.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Synchronoss's contract with AT&T, their control over the materially misleading misstatements, and/or their associations with the Company which made them privy to confidential information concerning Synchronoss, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew of and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The true state of Synchronoss's financial condition and operations, as well as the status of its single largest contract, were not and could not have been unknown to the personnel at the highest level of the Company, including the Individual Defendants, at the time of the filing of its quarterly reports.

70.     While Synchronoss may not have been able to determine the exact number of iPhones which were unlocked in any given period, it has always known exactly how many phones it has activated in any given period, because it bills AT&T for each phone.  Thus, Synchronoss has been able to estimate the number of iPhones unlocked, and the resultant impact on Synchronoss's business.

71.     Because of this knowledge, Synchronoss has always known to what extent the unlocking of iPhones posed a material threat to its relationship with AT&T.  Throughout the class period, even as reports of the unlocking phenomenon became public, Synchronoss simply refused to discuss or acknowledge the issue, or to inform investors of the material threat to its business that the unlocking phenomenon posed.

72.     Unbeknownst to investors, the unlocking phenomenon was pervasive enough to cost AT&T, Apple, and Synchronoss massive sums in uncaptured revenue.

73.     In a January 25, 2008 report Sanford Bernstein, analyst Toni Sacconaghi compared the number of phones reportedly sold by Apple with those reportedly activated on AT&T's network.  That report revealed a divergence of approximately 1.75 million phones.  In other words, 1.75 million iPhones had been "sold" according to Apple but not activated on AT&T's network.

74.     What neither Mr. Sacconaghi nor the rest of the investing public could determine was how many of the "missing" 1.75 million phones were currently held in inventory by AT&T, how many had been sold overseas by Apple, and how many had been unlocked.  Both AT&T and Apple, of course, knew this information and knew how much revenue they were missing out on due to the unlocking phenomenon.

75.     In response to this information, AT&T and Apple had only one choice--to insist that iPhones be activated when sold, in-store, thus preventing unlocking.  This meant removing Synchronoss from the activation process entirely.

76.     Because of their long-time contacts with AT&T, and because of the importance of the iPhone contract in particular to their business, the individual defendants and others within the

Company knew that Synchronoss would be removed from the activation process when the 3G iPhone was released in July.

77.     Rather than admit the truth, Defendants continued to paint a rosy picture of Synchronoss's outlook during the February 4, 2008 earnings call and in quarterly SEC filing. Neither the 10-Q nor the individual Defendants' remarks made any reference to the unlocking phenomenon, or made any effort to warn investors of the material threat to Synchronoss's business that the phenomenon posed.  Further, as noted above, even when Defendants were forced to guide down revenue expectations in a May 6, 2008 call, they continued to obscure the reasons for their reduced guidance, in an effort to portray Synchronoss as a company with large growth potential.

## CAUSATION AND ECONOMIC LOSS

78.     As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Synchronoss's financial, investment and business condition, business practices, and financial and business results, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Synchronoss and its financial, investment and business condition, results, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period were widely disseminated to the securities markets, investment analysts and to the investing public, and resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices.  Moreover, upon the revelation to the market and the investing public of the truth concerning Synchronoss and its results, operations, and prospects for growth, the

market price of Synchronoss common stock declined substantially, resulting in significant damages to the Plaintiff and other shareholders.

79.     Had the truth about Synchronoss been revealed to the market earlier, Plaintiff and the Class would not have purchased Synchronoss common stock or would have purchased the stock only at dramatically lower prices.

80.     When the truth about Synchronoss was finally fully revealed after the market closed on June 9, 2008, a significant portion of the artificial inflation that had been caused by Defendants' false and misleading statements (and omissions) was eliminated from the price of Synchronoss's common stock, causing significant losses to Plaintiff and the Class.  Specifically, on June 10, 2008, the first trading day after the revelations discussed herein, Synchronoss's stock price fell 17%, to close at $11.03, from a previous trading day close of $13.31.  Since then, the price of the Company's common stock has continued to plummet, trading as low as $8.18 per share on July 3, 2008.

81.     Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

82.     The market for Synchronoss's securities was open, well-developed and efficient at all relevant times for the following reasons (among others):

a.      The Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ;

b.      As a regulated issuer, Synchronoss filed periodic public reports with the SEC;

c.      Synchronoss regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      The market reacted to public information disseminated by Synchronoss;

e.      Synchronoss was followed by numerous material securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Synchronoss securities; and

g.      Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired Synchronoss securities between the time Defendants made the material misrepresentations and omissions, during which time the price of Synchronoss securities was inflated by Defendants' misrepresentations and omissions.

83.      As a result of the foregoing, the market for Synchronoss's securities promptly digested current information regarding Synchronoss from all publicly available sources and reflected such information in Synchronoss's securities prices.  Under these circumstances, all purchasers and acquirers of Synchronoss's securities during the Class Period suffered similar injury through their purchase or acquisition of Synchronoss's securities at artificially inflated prices and a presumption of reliance applies.

**THE STATUTORY SAFE HARBOR FOR
FORWARD-LOOKING STATEMENTS IS INAPPLICABLE HERE**

84.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Synchronoss who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against all Defendants

85.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.    This Count is asserted by Plaintiff on behalf of itself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

87.    During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Synchronoss's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Synchronoss's securities at artificially

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

88. Defendants, by use of means or instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Synchronoss's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

89. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

90. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. The Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

91.     As a result of Defendants' fraudulent activity, the market price of Synchronoss was artificially inflated during the Class Period.

92.     In ignorance of the true financial condition of Synchronoss, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Synchronoss containing the misleading information, purchased or otherwise acquired Synchronoss securities at artificially inflated prices during the Class Period.

93.     The market price of Synchronoss's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

94.     Plaintiff's (and the Class's) losses were proximately caused by Defendants' active and primary participation in Synchronoss's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff (and the members of the Class) purchased Synchronoss securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Synchronoss securities through their misconduct as described herein. Plaintiff's (and the Class's) losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, the true state of the business operations, growth prospects and financial condition of Synchronoss.

95.     Throughout the Class Period, Defendants were aware of material non-public information concerning Synchronoss's fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information and Plaintiff's (and the Class') losses were the foreseeable consequence of Defendants' concealment of this information.

96.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Synchronoss securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     As alleged herein, the Individual Defendants acted as controlling persons of Synchronoss within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

100.    As set forth above, the Individual Defendants and Synchronoss committed a primary violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the acts and

omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Synchronoss, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Synchronoss securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action;

B.      Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 5, 2008

**GARDY & NOTIS, LLP**


By:     s/ James S. Notis
        James S. Notis
        jnotis@gardylaw.com
        Charles A. Germershausen
        cgermershausen@gardylaw.com
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

**MILBERG LLP**
Peter Safirstein
psafirstein@milberg.com
Roland Riggs
rriggs@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel: 212-594-5300
Fax: 212-868-1229

*Counsel for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF

I, Barry Schutsky, certify that:

1. I have reviewed the complaint, authorized its filing, and authorize Milberg LLP to act on my behalf in this matter for all purposes.

2. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchasers of the subject securities described herein (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all my transactions in the securities of Synchronoss Technologies, Inc. (Nasdaq: SNCR) **DURING** the Class Period specified in the complaint as follows:

| Type of Security (Common stock, Preferred Stock, Calls, Puts or Bonds) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| | | | | |
| SEE ATTACHED SCHEDULE A | | | | |
| | | | | |
| | | | | |

(* List additional transactions on separate sheet, if necessary)

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this _____4TH_____ day of ___SEPTEMBER___, 2008

_Barry Schutsky_

Barry Schutsky

**Schedule A**
**Barry Schutsky**
**Synchronoss Technologies, Inc. (SNCR)**

|  | DATE | SHARES | SHARE PRICE | COST |
|---|---|---|---|---|
| **Purchase(s):** | | | | |
|  | 3/26/2008 | 200 | 20.24 | 4,048.00 |
|  | 5/13/2008 | 300 | 12.00 | 3,600.00 |
| **Sale(s):** | | | | |
|  | 3/25/2008 | 200 | 20.31 | 4,062.00 |