## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------------  :

In re   SYNCHRONOSS                  :     Civil Action No. 08-4437 (GEB)
      SECURITIES LITIGATION        :
                                    :
---------------------------------------------------  :     **O P I N I O N**

**APPEARANCES:**

*Counsel for Plaintiffs Herman Braude, Richard Kerwick, Barry Schutsky, Theodore E. Beaton and all others similarly situated:*[1]
      GARDY & NOTIS, LLP
            James S. Notis, Esq., Charles A. Germershausen, Esq.
            440 Sylvan Avenue, Suite 110
            Englewood Cliffs, New Jersey 07632
      MILBERG LLP
            Ariana J. Tadler, Esq., Todd L. Kammerman, Esq.
            One Pennsylvania Plaza, 49th Floor
            New York, New York 10119
      THE ROSEN LAW FIRM, P.A.
            Laurence M. Rosen, Esq.
            236 Tillou Road
            South Orange, New Jersey 07079
*Counsel for Defendants Synchronoss, Inc., Stephen G. Waldis and Lawrence R. Irving:*
      GIBBONS P.C.
            Brian J. McMahon, Esq., Joshua R. Elias, Esq.
            One Gateway Center
            Newark, New Jersey 07102
      BINGHAM McCUTCHEN LLP
            Jordan D. Hershman, Esq.; Jason D. Frank, Esq.;
            James P. Lucking, Esq.; William R. Harb, Esq.
            One Federal Street
            Boston, Massachusetts 02110

## TABLE OF CONTENTS

---

[1]  At the instant juncture, the matter at hand is a putative class action.  Mr. Jeffrey L. Ornoff, who is one of the Plaintiffs identified on the docket, neither joined other Plaintiffs on their briefs (or even on the complaint at hand) nor submitted his own pleadings and/or briefs. The Court, therefore, has no information as to whether Mr. Ornoff is still a Plaintiff in this matter.

I.      Introduction
II.     Background
III.    Parties' Contentions
        A.      Dismissal Motion
                1.      Plaintiffs' Position
                        a.      Overall Factual Assertions
                        b.      Four Lines of Plaintiffs' Allegations
                                i.      Allegations Related to the iPhone 3G
                                ii.     Allegations Related to "Unlocking"
                        c.      Plaintiffs' Additional Contentions and Legal Claims
                2..     Defendants' Position
        B.      Strike Motion
IV.     Discussion
        A.      Strike Motion
                1.      Evidentiary Aspects
                2.      Procedural Aspects
        B.      Dismissal Motion
                1.      Pleading Requirements
                        a.      Rule 8 Pleadings
                        b.      Pleading Under Rule 9 and the Reform Act
                2.      Substantive Law
                        a.      Element Pled Pursuant to Rule 8:  Materiality
                        b.      Elements Pled Pursuant to Rule 9
                                i.      Reliance
                                ii.     Scienter
                                iii.    Forward-looking Statements
                                iv.     Omissions
                        c.      Liability of Controlling Person
                3.      Claims Based on Defendants' Forward-Looking Statements
                        a.      Future Projections Allegedly Related to the iPhone 3G
                        b.      Future Projections Allegedly Related to "Unlocking"
                                i.      "False Failure to Project" as a Cause of Action
                                ii.     Insufficiency of Pleadings
                                iii.    Substantive Insufficiency of the Claim
                4.      Claims Based on Defendants' Alleged Omissions
                        a.      Lack of Duty to Disclose Ensuing from Waldis and Irving's Trades
                        b.      Allegations as to Omissions and/or Duty to Correct or Update
                                i.      Omissions as to the iPhone 3G
                                ii.     Omissions as to the Change in Synchronoss' Revenue
        C.      Leave to Amend
V.      Conclusion

**GARRETT E. BROWN, JR.**, Chief Judge:

I.    **INTRODUCTION**

This matter is before the Court upon Defendants' motion ("Dismissal Motion"), see Docket Entry No. 24, seeking dismissal of Plaintiffs' Consolidated Class Action Complaint ("Complaint"). See Docket Entry No. 22.  Plaintiffs filed their opposition to the Dismissal Motion ("Dismissal Opposition"), see Docket Entry No. 25, to which Defendants filed a reply ("Dismissal Reply").  See Docket Entry No. 30.  The foregoing submissions appear to be intertwined with Plaintiffs' later filed motion ("Strike Motion") requesting the Court to strike certain Defendants' arguments raised in the Dismissal Motion.  See Docket Entry No. 27.  Defendants filed their opposition to the Strike Motion ("Strike Opposition"), see Docket Entry No. 31, to which Plaintiffs filed a reply ("Strike Reply"). See Docket Entry No. 32.

For the reasons detailed below, Plaintiffs' Strike Motion will be denied, without prejudice, as premature.  Defendants' Dismissal Motion will be granted on grounds unrelated to Plaintiffs' Strike Motion, and the Consolidated Class Action Complaint will be dismissed.  Such dismissal, however, will be without prejudice, and Plaintiffs will be granted leave to cure the deficiencies of their pleadings.

II.   **BACKGROUND**

Plaintiffs brought this action on behalf of a putative class consisting of all persons and entities that purchased or otherwise acquired securities ( seemingly, common shares only) issued by Synchronoss during a slightly more than four month period, from February 4, 2008 to June 9, 2008, both dates inclusive ("Class Period").  See Compl.  ¶ 2.

According to the Complaint, Defendant "Synchronoss [Technologies] is a Delaware corporation[,] with principal executive offices located at . . . Bridgewater, New Jersey[2] . . . .  As of August 27, 2008, [Synchronoss] had approximately 31.4 million shares outstanding that traded on the NASDAQ under the symbol 'SNCR.'" Compl. ¶12.  While the technical endeavors in which Synchronoss is involved are complex and multiple, it can be said that Synchronoss is, generally, in the business of creating and licensing software used by other business entities, which are involved in providing wireless services; one of the functions that Synchronoss' software can perform is activation of wireless devices from remote locations, e.g., remote (meaning, online/off-site) activation of  iPhones (mobile/cell phones produced by Apple Inc. ("Apple").[3]  See id. ¶¶ 26-27.

---

[2]  The Complaint also names two other Defendants, Stephen G. Waldis and Lawrence R. Irving.  According to the Complaint, "Stephen G. Waldis ('Waldis') is co-founder, President, Chairman and Chief Executive Officer of Synchronoss [and] has served as President and Chief Executive Officer of Synchronoss since . . . 2000."  Compl. ¶ 13.  "Lawrence R. Irving ('Irving') was [the] Chief Financial Officer and Treasurer of Synchronoss" during the Class Period.  Id. ¶ 14.  Both Waldis and Irving sold some of their Synchronoss shares during the Class Period.  See id. ¶¶ 13-14.

[3]  Syncronoss' own home webpage describes the company's lines of business as follows: "Synchronoss Technologies is [a] provider of on-demand transaction management software platforms."  See <<www.synchronoss.com>>.  The parties – being, perhaps, too familiar with the technological intricacies underlying the legal issues at hand – outlined the facts in a broad and often highly technical format.  See, e.g., Dismissal Mot. at 4 (stating that "Synchronoss is a leading provider of software management platforms," even though Synchronoss' marketplace position is not an issue in the case at bar, and the term "software platform" is an ambiguous technical term simply meaning a software "basis" upon which either a single or a multitude of other software programs is/are based.  For instance, both the celebrated operating system known as "Windows" and an unheard-of  program capable of supporting just one other obscure software application, would qualify as "software platforms").  The Court, therefore, finds it useful to set forth the background in more detailed and somewhat layperson's terms to enable a more precise business and legal discussion.

Apple is a corporation that designs and manufactures consumer electronics and computer software; Apple's most well-known hardware products include Macintosh computers, the iPod, the iPhone, etc.  Steven "Steve" Paul Jobs is the co-founder and chief executive officer of Apple.

The history of the iPhone began with a conclusion reached by Steve Jobs in 2003 that the high-tech future belonged to mobile phones that could also operate as devices enabling access to portable information.  By that time, Jobs had Apple put its energies into the iPod, a portable media player, and the corresponding iTunes software, a digital media player application used for purchasing and downloading digital music and video files.  In September 2006, Apple released a new version of iTunes that included references to a then-yet-unknown mobile phone which was announced four months later as the "iPhone"; the iPhone was actually introduced into the market on June 29, 2007.[4]

The iPhone is an excellent example of what is commonly known as a "smartphone," meaning that it is a mobile telephone offering computer-like capabilities, i.e., it is an advanced cell phone (allowing such features as text messaging, visual voicemail, audio conferencing, call holding, call merging, caller ID, etc.) that also functions as a camera and a portable media player equivalent to a video iPod, allows the user a Wi-Fi connection with complete access to the Internet (including email, full web browsing, etc.) and, in addition, performs many other functions.

When the original version of iPhone was introduced to the purchasing public in 2007, TIME Magazine named it the Invention of the Year.  The second generation of the iPhone, popularly known as the "iPhone 3G," is an even more advanced device capable of receiving and processing

---

[4]  The first advertisement for the iPhone was aired four months prior, on February 25, 2007, during the 79th Academy Awards; it featured clips from famous movies and television shows where the characters were answering telephones and saying "hello"; the commercial ended with the line reading "Hello. Coming in June."

data faster than the original iPhone; it also performs additional and more complex functions than the original iPhone and, in addition, ensures that the user -- even if (s)he is located in an area suffering from a poor cell phone connection -- could nonetheless access the transmission frequency securing due reception.[5]

Apple tightly controls most aspects of the iPhone; for instance, the iPhone's operating system is designed to only run software that has an Apple-approved "cryptographic signature," i.e., the code protecting against alterations or corruptions.

All iPhones must -- theoretically -- be "activated," meaning that they have to be assigned a telephone number and carrier before the user could obtain assess to iPhone features.  For the purposes of the United States market, all iPhones are "locked," in the sense that the creators of the iPhone tried (and keep aggressively trying) to ensure that the iPhone could be used only with one particular authorized carrier, namely, AT&T, which is Apple's partner network.[6]

However, various "hackers," who are unwilling to switch from their carriers to AT&T either out of customer loyalty or because they are planning to use different service providers when traveling to Europe/ Asia (in order to avoid the roaming fees charged by AT&T on overseas calls), or because they simply dislike AT&T's subscription terms or AT&T as a business entity, found methods to

---

[5]  The "iPhone 3GS," that is, the third generation of the iPhone, was announced as recently as on June 8, 2009; it has an even better performance and features than the iPhone 3G, e.g., the iPhone 3GS includes a camera with video capability and even better image sensors, a voice control, etc. However, the iPhone 3GS has no relevance to the matter at hand.

[6]  The effect of the "lock" feature can be illustrated by the following example: if the owner of a "locked" iPhone tries to leave AT&T and, instead, to use another cellular service provider, his/her iPhone simply would not work.  Similarly, if the owner travels abroad and tries to use another company's cell phone service on his/her iPhone, his/her iPhone would not work either.

"unlock" – meaning, to "activate" – their iPhones in order to use them with unauthorized carriers (that is, carriers other than the AT&T) after such "unlocking."[7]   In sum, it can be said that "unlocking" is the process by which a cell phone (or any mobile device) is made compatible with telephone network(s) it was not specifically licensed to be used with.

Many owners of smartphones (including the owners of iPhones) are, however, not concerned with the issue -- or not concerned with only the issue -- of changing their service providers: rather, they want to gain control over the applications/software they can install on their mobile devices. Presumably, the reason is that many smartphone manufacturers "lock" the devices so that only their approved applications can be installed.  Apple is no exception to that practice, and the iPhone can only install applications purchased from Apple's App Store (since the iPhone's operating system is designed to run only the software that has an Apple-approved cryptographic signature); therefore, if there is an application an owner of the iPhone wants to install that is not officially approved and offered by Apple, (s)he out of luck.  However, similar to the "unlocking" restriction (relevant for the purposes of phone "activation"), this installment-of-software restriction could be overcome by "jailbreaking" the phone, that is, by replacing the iPhone's firmware with a slightly modified version that does not enforce the signature check.

---

[7]   There are two cell phone technologies that are used by the majority of the world's mobile phone service providers: Global System for Mobile communication ("GSM") and Code Division Multiple Access ("CDMA").  GSM phones use subscriber identity module ("SIM") cards, which are small physical cards inserted into the handsets; these cards contain the owner's contacts, settings and account information.  Theoretically, a phone owner can take his/her SIM card out, put it into another phone, and if someone calls this phone owner's phone number, then that other phone should ring.  However, if a phone is "locked," it means that the service provider has installed some software on the phone that ties the subscriber ID number on the SIM card to the serial number of that particular handset and --  if the SIM card and phone serial number don't match -- the phone simply won't work.  Consequently, the "locked" phone's SIM card would not work in other phones, and the "locked" phone would not work with other SIM cards.

While the goals and technical aspects of "unlocking" and "jailbreaking" are qualitatively different,[8] the financial implications of these processes are somewhat similar for the purposes of both Apple and AT&T.  In the case of "unlocking," AT&T is prevented from collecting fees associated with its acting as a carrier of cell phone accounts of the iPhone owners, while in the case of "jailbreaking" – Apple is prevented from collecting the fees associated with the iPhone owners' installment and/or usage of Apple's App Store software applications.[9]  Consequently, beginning in September 2007, Apple has been releasing various technical updates and new firmware aimed at either relocking the "unlocked/jailbroken" iPhones or to "bricking" such devices (i.e., rendering these "hacked" devices inoperable).

It appears that Synchronoss was the entity which created the program allowing Apple/AT&T to offer their customers an opportunity to self-activate their new iPhones.  In other words, in contrast with the traditional model necessarily requiring a customer to go through the process of in-store purchase-and-activation of his/her new iPhone, Synchronoss' program (adopted by Apple/AT&T) allowed the customer to choose between: (1) the in-store purchase-and-activation;  and (2) an opportunity to (a) purchase an iPhone (either in-store or online); and then (b) self-activate this new iPhone from the comfort of the customer's own home via iTunes.  Since the self-activation option permitted iPhone purchasers to physically take their yet-to-be-activated iPhones outside AT&T' stores, such option also provided these purchasers with a "window-of-opportunity" during which

---

[8]  There are additional differences as to the (il)legality of these processes. However, the matter at hand does not turn on the (il)legality of these processes and, hence, does not necessitate any discussion of the Digital Millennium Copyright Act or of the November 17, 2006, decision by the United States Copyright Office, or of any other legal sources addressing this issue.

[9]  The Court need not inquire into any financial relationship between Apple and AT&T, e.g., partnership fees, royalty collections, etc., since these aspects are not implicated in this case.

they could "hack" their new iPhones by "unlocking" their new devices.  In light of the obvious financial losses caused by the practice of "unlocking" original iPhones, Apple/AT&T – starting from release of Apple's iPhone 3G – decided to part with the customer-convenient-but-profit-endangering model of self-activation and elected to permit only the old-but-financially-more-secure model of in-store purchase-and-activation.  Consequently, Synchronoss' off-site/online self-activation program became of no use for the purposes of the iPhone 3G, causing the stream of compensation Synchronoss was receiving from Apple/AT&T for the use of its program to progressively dry up, since Synchronoss' program kept being used only for the purposes of off-site activations of the original iPhones that were (re-)entering the market.[10]

## III.   PARTIES' CONTENTIONS

### A.   Dismissal Motion

#### 1.   Plaintiffs' Position

##### a.   *Overall Factual Assertions*

For reasons not entirely clear, and -- seemingly -- without any correspondence to the remainder of Plaintiffs' allegations, the Complaint opens with Plaintiffs' contention that "Synchronoss' [self-activation program was designed]  to *prevent* Apple iPhones from being activated with wireless phone carriers other than AT&T," Compl. ¶ 2 (emphasis supplied), even though it appears that the Synchronoss' program[11] was *not* designed to be a "lock" (or an anti-

---

[10]  See note 16, infra, for discussion of the ambiguities as to the current use of Synchronoss' program.

[11]  Synchronoss' self-activation software/program was, seemingly, an "adopted-to-the-iPhone" version of Synchronoss' umbrella program, known as "ConvergenceNow."  See Compl. ¶ 44.  (The Court cannot exclude the possibility that Synchronoss' software referred to in Synchronoss' reports as "ActivationNow" was the particular software used by Apple/AT&&;

"hacking" device) of any kind and, indeed -- for the purposes of phone activation -- such "lock" was already imbedded in the iPhone *by Apple itself*, via its firmware intertwined with its GSM system (using the SIM cards tied to each iPhone's serial number).  Accord Compl. ¶ 28 ("Synchronoss provided the software allowing U.S. purchasers of the iPhone to activate that device from their home computers for use on AT&T's network").  Thus,  while -- as detailed infra -- the Court is obligated to take all Plaintiffs' factual allegations as true for the purposes of Defendants' Dismissal Motion, the Court presumes that this particular piece of information (i.e., the allegation seemingly suggesting that Synchronoss was hired, but failed, to protect the iPhone from "unlocking" or other forms of hacking) was included by Plaintiffs in the Complaint as a result of inadvertence.

The remainder of Plaintiffs allegations do not appear inherently self-contradicting.

According to the Complaint, Synchronoss, in its report addressing the second quarter of 2007, "[a]nnounced a multi-year contract with AT&T to support the launch and ongoing operational support of the Apple iPhone."  Id. ¶ 33.  The  utilization of ConvergenceNow by AT&T "allowed Synchronoss to profit every time an Apple iPhone was activated on the AT&T network."[12]  Id. ¶¶

---

indeed, such name appears more appropriate.  However, in light of Plaintiffs' firm assertion that the program was named "ConvergenceNow," the Court is not in a position to question Plaintiffs' terminology.)  Since no other version of ConvergenceNow appears relevant to the matter at hand, the Court uses the terms "ConvergenceNow" as the name of the software at issue.

[12] Simply put, Synchronoss was paid for each iPhone activated via ConvergenceNow: if a consumer purchased an iPhone but did not activate it through ConvergenceNow, Synchronoss did not receive any revenue.  For example, regardless of whether an Apple/AT&T salesperson activated the iPhone in the store, or if the iPhone was never activated at all or if it was activated through unlocking, Synchronoss received no payment.  See Compl. ¶ 30. Since the process of "jailbreaking" has no relevance whatsoever to the process of activating the iPhone (because it is, by definition, a post-activation process), it has also no relevance whatsoever to Synchronoss' finances.  Therefore, short of having the mechanism of "jailbreaking" briefly defined in this Opinion (in order to address the parties' reference to it), the Court does not discuss the process at all.

2, 29.  In 2007, Synchronoss' gross receipts from off-site iPhone activations via ConvergenceNow amounted to 32.38% of Synchronoss' gross revenue.[13]  Id. ¶¶ 2, 31, 44 and 50.  By the beginning of the Class Period, "Synchronoss continued to maintain that the iPhone was producing and would produce tremendous results for [Synchronoss,] and [Synchronoss'] financial condition was strong." Id. ¶ 4.

The Complaint further alleged that, because: (a) "[a]t the time the iPhone was released, it was unlike any other phone on the market[; and (b)] most consumer wireless contracts [were, as they typically] are[,] two years in length . . . , [some investors, Plaintiffs included, as well as some] technical journalists and [some] financial analysts[[14] somehow] believed that the number of iPhone sales would increase in coming years," and Synchronoss' income from off-site activations [of iPhones] would show an "astronomical growth."[15]  Id. ¶¶ 32, 38.  The aforesaid beliefs of these

---

[13]  According to Paragraph 2 of the Complaint, "AT&T accounted for nearly 80% of Synchronoss' revenue during the Class Period."  According to Paragraph 31 of the Complaint, "AT&T accounted for approximately 76% of Synchronoss' 2007 revenues."  According to Paragraph 31, "Synchronoss had $123.5 million of revenues in 2007, and the iPhone contributed $40 million of those revenues."  Compl. ¶ 31 (seemingly deducing the figures from the allegations made in ¶¶ 44 and 50).  "Therefore, the iPhone was . . . contributing nearly one-third of the revenue coming into Synchronoss in 2007."  Id.  The Court presumes that -- in 2007 -- the iPhone-based receipts accounted for the percentage of Synchronoss' gross revenue equal to the share that $40 million constitutes in comparison to $123.5 million.

[14]  The "technical journalists and financial analysts" specified by Plaintiffs are "ThinkEquity Partners LLC" and "C.E. Unterberg," plus someone referred to as "financial pundit Chris Versace."  See Compl. ¶¶ 34-36, 39.  The Court is not clear as to which of these persons/ entities qualifies as a "journalist" and which as "financial analyst," and how these qualifications were made.  (The Court presumes that Plaintiffs refer to themselves and the putative class as the "investors").  However, it appears rather certain from the face of the Complaint that none of these "journalists" or "financial analysts" operated as spokesperson(s) for -- or were otherwise retained by / acted as agents of -- Defendants.

[15]  While a detailed discussion of Plaintiffs' assertions is provided infra, the Court notes that the logic of Plaintiffs' economic assertion is not clear, since it appears that -- if there was a

"journalists, financial analysts and investors" were, apparently, fueled in 2008 by the exact-content-unspecified rumors of unspecified origin, the gist of which was that the iPhone 3G would soon be released and, also, available for off-site self-activation, and, in addition, that Synchronoss would, also, handle these off-site activations of iPhones 3G.  Plaintiffs maintain that this rumor-based three-step deducement had to be warranted because: (a) Synchronoss had widely publicized its 2007 "multi-year contract with AT&T to support the launch and ongoing operational support of the Apple iPhone," id. ¶ 2, 29, 33; and (b) Synchronoss was not discussing/projecting/publicizing the possibility that it might be excluded from off-site activations of future models of the iPhone, or that these future models of the iPhone (the iPhone 3G inclusive) could be, altogether, not offered by Apple/AT&T  for off-site activation.   See id. ¶¶ 32-34; Dismissal Opp., at 5-6 (asserting that Plaintiffs' deduction as to Synchronoss' upcoming off-site activation of the iPhone 3G was necessarily logical simply because "Defendants said nothing to the contrary").

**b.** ***Four Lines of Plaintiffs' Allegations***

Plaintiffs assert that, on May 6, 2008, . . . [Synchronoss] announced that it had 'materially lowered' its [financial projections] for [the remainder of] 2008 due[,] in large part[,] to declining

---

certain nation-wide "X" market of consumers interested in the iPhone and capable of affording it, the joint effect of: (a) sweeping popularity of the iPhone; (b) lack of competition from other, less-advanced, smartphones; and (c) dominance of two-year phone contracts, should have yielded, first, a relatively swift saturation of the X market and, then, a rather substantial lull in purchasing (and a corresponding lull in activation) of the iPhones for about two years, i.e., during the time when the bulk of the X market is already tied by these two-year contracts, and the pool of new entrants is slowly trickling in, mainly when -- and if -- the price of the iPhone drops (i.e., when the size of the X market marginally increases upon absorption of every new market segment which becames capable of affording the iPhone as a result of the latest iPhone price reduction).

revenue associated with Apple's iPhone."  Compl. ¶ 4.  From this statement on, the Complaint, as well as the Dismissal Opposition, seems to run on the following four, rather distinct, tracks of allegations, although these allegations are at first heavily interwoven, if not plainly conflated, but then presented in a somewhat patchy fashion.

Specifically:

(a)     some assertions seem to suggest that Defendants unduly concealed the known-to-them truth about the financial effect the practice of "unlocking" was taking on Synchronoss' revenue;

(b)     another line of allegations, also related to the practice of "unlocking," does not address the issue of what Defendants omitted to disclose about the then-existing financial situation of Synchronoss; rather this line of allegations seems to imply that Defendants wrongly forecasted (or did not correct their prior forecast as to) Synchronoss' future revenue by not factoring in the potential negative impact which the practice of "unlocking" might take on Synchronoss' revenue in the months to come;

(c)     the third line of assertions has nothing to do with the practice of "unlocking."  Rather, these allegations seem to imply that Defendants' statements about Synchronoss' "multi-year" contract and, perhaps, the overall optimistic tone of Defendants' future projections, somehow misled the investors into believing that: (i) the iPhone 3G would necessarily be available for off-site/online activation; (ii) Synchronoss would necessarily be involved in such online self-activation and would, thus, derive revenue on a per-activation basis, as was the case with the original iPhone; and (iii) because the iPhone 3G would be a more advanced device in comparison with the original iPhone, it would necessarily be even more popular than the

original iPhone, and that would necessarily result in Syncronoss' receipt of even more lucrative profit from off-site activation of the iPhone 3G.  See generally, Compl.; and

(d)    the final line of allegations seems to suggest that, even prior to June 9, 2008, Defendants knew, for a fact, that Apple/AT&T decided not to involve Synchronoss in the process of activating iPhones 3G, but Defendants omitted to disclose this fact to the investors.[16]

In addition to these four lines of allegations, Plaintiffs state a line of derivative claims against Waldis and Irving.  See note 29, infra.

### i.    *Allegations Related to the iPhone 3G*

---

[16]   The original iPhone, that is, brand new handsets of the original version, stopped being sold in June of 2008 (seemingly, they were pulled off the store shelves sometimes between June 13 and 16 of 2008).  However, "second-hand" original iPhones stayed in the market and, it appears, that a legitimate – that is, non-unlocking – activation of these iPhones by their second-hand owners can still be performed online, via iTunes, as it was allowed to the original owners of these handsets.  Similarly, it appears that – in the event the in-store activation of new iPhones 3G devices does not work (for whatever reason) – the purchasers of such still-non-activated devices are directed (or, at least, allowed) to activate their iPhones 3G online/off-site, also via iTunes (same as was done with the original iPhones), although the Court is not entirely clear as to whether: (a) such default off-site activation of iPhones 3G was eventually phased out; and (b) such default off-site activation involved ConvergenceNow or ConvergenceNow was replaced by Apple's own off-site activation software.  See, e.g., <<http://artoftheiphone.com/2009/02/10/ how-to-activate-a-used-iphone>>; <<http://www.theiphoneblog.com/2008/06/13/original- iphone-2g-pulled->>; <<http://www.engadget.com/2008/06/09/iphone-3g-is-finally-official>>; <<http://www.betanews.com/article/iTunes-activation-outages-are-render>>; <<http://www. engadget.com/2008/07/11/itunes-activation-servers-go-down>>: <<http://www.boygenius report.com/2008/06/09/iphone-3g-the-details-you->>; <<http://arstechnica.com/apple/news/ 2008/06/memo-hints-at-itunes-activati>>; <<http://arstechnica.com/apple/news/2008/ 06/apple-and-att-drop-online->>.  The only relevant information this Court could detect is Plaintiffs-pled Synchronoss' May 6, 2008, projection of $10 million revenue per annum from iPhone activations: this statement might be interpreted as suggesting use of ConvergenceNow for the purposes of at least re-activation of second-hand iPhones (if not for the purposes of default off-site activation of iPhones 3G).  Indeed, had it been otherwise, Synchronoss should not be able to derive any revenue from iPhones starting from mid-summer of 2008.  Unfortunately, the submissions of both sides are wholly silent as to this -- seemingly rather important -- fact.

Plaintiffs assert that when, on May 6, 2008, Synchronoss "announced that it had 'materially lowered' its [financial projections] for [the remainder of] 2008 due[,] in large part[,] to declining revenue associated with Apple's iPhone," Synchronoss failed to disclose the allegedly already-known-to-Defendants fact that Synchronoss' services would not be utilized for the purposes of the iPhone 3G.  Id. ¶¶ 5-6.

The information that Synchronoss' services would not be utilized with regard to the iPhone 3G was publicized by AT&T on June 9, 2008. Id.  According to the Complaint, on the next day, that is, on "June 10, 2008, [Synchronoss] confirmed [AT&T's] announcement and *admitted* that [its non-retention by Apple/AT&T for the purposes of the iPhone 3G] was a reason" for Syncronoss' release of lower financial projections on May 6, 2008.[17]   Id. ¶ 6 (emphasis supplied).  Although the Complaint does not inform the Court about the actual "admission" language by Defendants, Plaintiffs seem to deduce the fact of such admission from the language of Synchronoss' 8-K Report filed with the SEC June 10, 2008.  That Report read, in relevant part, as follows:

> on June 9, 2008, AT&T announced the expansion of its relationship with Apple relative to the much anticipated launch of the 3G Apple iPhone.  Synchronoss will continue [its] relationship with AT&T as it relates to the activation and provisioning of Apple iPhones.  However, *Synchronoss will not participate in the on-site, retail store activations associated with the 3G iPhone, which was already taken into consideration when we provided our revised financial outlook on our first quarter 2008 financial results conference call.*

Compl. ¶ 51 (emphasis supplied by Plaintiffs).

Plaintiffs seek to explain their allegations as follows: "By admitting that the revision downward of [Synchronoss'] full year 2008 [projections] was partially due to the fact that

_____

[17]  While the May 6 announcement lowered the value of Synchronoss' common stock by $9.86 per share, the June 10 announcement caused an additional drop of $2.28 per share.  See Compl. ¶¶ 4, 6.

[Synchronoss] would not be involved with the activation of the 3G iPhone, Defendants also admitted that their [projections,] issued on February 4, 2008, [were] based upon the presumption that [Synchronoss] would be involved with the 3G, which they already knew was not going to occur." Compl. ¶ 52.  However, this purported clarification offers more problems than solutions.  First, it is not clear as to how one can possibly base his/her projection on a presumption (s)he has not actually presumed.  At best, one could surmise that Plaintiffs seek to assert that: (a) Defendants knew that their services would not be utilized in activations of the iPhone 3G; but (b) Defendants' 2008 projections, nonetheless, factored in the receipts from off-site activations of the iPhone 3G.

However, this odd turn of phrase presents a minor concern.  A far more substantial problem with Plaintiffs' deduction is that the 8-K Report quoted by Plaintiffs merely stated that "Synchronoss will not participate in the *on-site, retail store activations* associated with the 3G iPhone."  Id. ¶ 51 (emphasis supplied).  That statement is qualitatively different from Plaintiffs' leap of logic reading it as Synchronoss' admission of long-time knowledge that Synchronoss would not be involved in *any activation* (including *off-site*, *online* activation) of the iPhone 3G.  Contrary to Plaintiffs' deduction, it seemed quite logical for Synchronoss to factor in its non-involvement in *on-site, retail store activations*:[18] indeed, Synchronoss' ConvergenceNow program was *never designed for such use*; rather, it was expressly created only for off-site/online activation.[19]

---

[18]  If anything, Defendants' announcement appears to be in line with the possibility that ConverdenceNow was utilized for activation of all second-hand original iPhones (and, perhaps, for default online activation of iPhones 3G, i.e., for activations that could not be performed in store immediately upon the purchase).  Accord note 16, supra.

[19]  A virtually identical logical flaw taints Plaintiffs' assertion that Synchronoss' widely publicized contract with Apple/AT&T necessarily had to lead the investors to the conclusion that Synchronoss' services would be utilized for the purposes of *every* future model/generation of the iPhone.  According to the Complaint, Synchronoss merely "[a]nnounced a multi-year contract

In light of the foregoing, Plaintiffs' assertions (i.e., (a) that Defendants' 8-K Report of June 10, 2008, contained an "admission" that Defendants knew the iPhone 3G would not be available for off-site self-activation and, thus, would not utilize ConvergenceNow; and (b) that Synchronoss' publication of its multi-year contract with AT&T was effectively equal to an announcement that Synchronoss would service off-site activation of either all future models of the iPhone or, at the very least, of the iPhone 3G) appear to state not a fact but a factless self-serving conclusion.

Another set of allegations, seemingly related to the iPhone 3G, consists of the following four assertions:

a.    [Synchronoss] invested a large amount of time [i.e., months] and work . . . preparing [its umbrella version of ConvergenceNow for the specific use with the original iPhone]. Compl. ¶ 28.

b.    A former Manager of Information Technology at Synchronoss in Bethlehem, PA [employed by Synchronoss] until March 2008, who was personally involved with the task of purchasing over a million dollars worth of equipment *for the development and launch of the 2G phone*,[20] stated that it would be a matter of months versus weeks

---

with AT&T to support the launch and ongoing operational support of *the Apple iPhone*." Compl. ¶ 33 (emphasis supplied).  No part of this announcement, at least as it is quoted in the Complaint, includes any statement suggesting, even remotely, that the term "the Apple iPhone" must mean either every future model of the iPhone or the iPhone 3G, rather than the original iPhone only. Indeed, it appears that, to an unbiased observer, the phrase "the Apple iPhone" should mean exactly that: a reference to the original iPhone only rather than to any later version of the iPhone.

    [20]  The Court is not entirely clear as to what is the meaning of Plaintiffs' "2G phone" term since, typically, the term "2G" is used as a reference to second-generation wireless telephone technology (launched in early 1990's), pursuant to which phone conversations were digitally encrypted and text messages were enabled.  Since any modern mobile phone is necessarily "2G,"and because the original iPhone was less advanced than the iPhone 3G, the Court presumes that Plaintiffs refer to the original iPhone as a "2G phone." However, even with such assumption, it is entirely unclear to this Court why Synchronoss' former Manager of Information Technology was "purchasing . . . equipment for the development and launch" of the original iPhone since, even if this Court were to presume that a computer scientist / technical executive (rather than the purchasing department) was, somehow, in charge of the task of conducting such purchasing, this purchasing of equipment *for the purposes of creating the original iPhone* was done *exclusively*

for Synchronoss to gear up for the launch of the 3G iPhone. Moreover, he stated that the Company laid off their most senior technical staff, including the Senior Windows Engineer and the Senior Network Engineer who would have been essential to working on the 3G iPhone in the months before it was launched. The Company's laying off of its senior technical staff essential that would have been essential [sic] to the 3G iPhone is a strong indication that Defendants knew at that time that Synchronoss would play no role in activating the 3G iPhone. Id. ¶ 47 (emphasis supplied).

c.   A former Synchronoss Agent Supervisor in Bethlehem, PA from July 2007 through March 2008 stated that the Company terminated many people in February 2008. Id. ¶ 48.

d.   According to a former Synchronoss software engineer employed by the Company until February 2008, the layoffs in February 2008 were of permanent employees. Id.

These four assertions seem to suggest, jointly, the following two sentiments: (1) since it took Synchronoss months to alter its umbrella version of ConvergenceNow for off-site activation of the original iPhone, it necessarily had to take Synchronoss at least a comparably lengthy period of time to re-alter its tailored-to-the-original-iPhone version of ConvergenceNow for off-site activation of the iPhone 3G; and (2) such re-alteration had to also be so technically complex that layoffs of certain permanently employed managers and senior engineers, and some other permanent staff, would automatically render the task of such re-alteration virtually insurmountable.

The problem with these assertions is two-fold. First, to a person lacking expertise in high-tech matters, as is the case with this Court, the argument appears plainly conclusory. Indeed, while

---

by Apple and had nothing to do with Synchronoss. The sole task performed by Synchronoss was the creation/adoption of its ConvergenceNow software for the purpose of remote activation -- rather than development -- of the original (or any) iPhone. In light of the foregoing, the Court is even more unclear as to why the adoption of ConvergenceNow required "million dollars worth of equipment," since a computer program is an item that might have a substantial intellectual value but is invariably of only nominal physical value, and -- to top it all off -- a typical process of software development requires little more than a good set computers, routers and brain power of computer programmers, with the latter (rather than the equipment) being the costliest component.

the iPhone 3G is a more advanced technical device in comparison with the original iPhone, that fact,

in and by itself, does not necessarily indicate that the *computer program activating this advanced*

*device* electronically must be qualitatively different from the computer program activating the

original iPhone and/or that the process of modification of the original computer program would be

as complex as the process of creating that original program from scratch.[21]  Second, even if the Court

were to hypothesize that an expert computer programmer could verify Plaintiffs' conclusions

sufficiently to meet the requirements of the Federal Rules of Evidence, this presumption cannot cure

the deficiencies of Plaintiffs' pleadings since the above-quoted assertions – being merely pled by

Plaintiffs in the Complaint – still cannot be qualified as facts: at best, they could be qualified as an

inadmissible non-expert opinion.   Consequently, the only pled *fact* the Court could gather from the

four above-quoted assertions is that, in February of 2008, Synchronoss laid off an unspecified

number of employees, some of which had senior positions and some of which were permanent staff.

### ii.        *Allegations Related to "Unlocking"*

As noted <u>supra</u>, Plaintiffs' Complaint suggests two lines of allegations related to "unlocking,"

namely: (1) allegations seemingly indicating Plaintiffs' position that Defendants concealed the

known-to-them truth about the effect "unlocking" was taking on Synchronoss' revenue; and (2)

assertions that Defendants issued false financial projections by not factoring in the possible negative

effect the practice of "unlocking" was capable of causing to Synchronoss' future revenue.

---

[21]   Indeed, the advancement of the underlying product might have little to do with the complexity of the process needed for the product activation and/or management.  <u>See</u> note 16, <u>infra</u>, discussing the possibility that ConvergenceNow might have been indeed utilized (either in its unaltered-from-the-original-iPhone version or in a successfully altered – regardless of Synchronoss' workforce cuts/substitutions -- version) for default off-site activation of those iPhones 3G that could not be activated in store upon purchase.

Six events are described in the Complaint with respect to these "unlocking"-based challenges.

They are:

1.     On February 4, 2008, Synchronoss held its fourth-quarter-of-2007 earnings call. <u>See</u> Compl.

      ¶ 56. Both Defendants Waldis and Irving made certain statements during the call. <u>See</u> <u>id.</u>

      Specifically:

        a.     Waldis stated: "We are extremely pleased with the continued high level performance

           that our ConvergenceNow [program] has delivered [for the purposes of] activation

           of the Apple iPhone." <u>Id.</u> Plaintiffs read this statement as an utterance intentionally

           disguising the effect the practice of "unlocking" had been causing -- or could cause --

           to Synchronoss' then-accrued and/or future revenue.[22] <u>See</u> Dismissal Opp., at 7.

        b.     Irving forecasted Synchronoss first-quarter-of-2008 revenue at $30 to 32 million, and

           full revenue for the year 2008 at $151 to $160 million.[23] <u>See</u> Compl. ¶ 58. Plaintiffs

---

[22] Plaintiffs also read an accompanying statement made by Waldis, <u>i.e.</u>, the statement that Synchronoss was "thrilled to be part of the AT&T-Apple relationship," as an utterance stating that Synchronoss would necessarily be involved in off-site activation of the iPhone 3G. <u>See</u> Dismissal Opp., at 7.

[23] The Court notes that it is not clear as to Plaintiffs' reasons for including technical -- and, seemingly, irrelevant -- accounting and financial terminology (and corresponding accounting and financial data) in the Complaint. For instance, discussing Irving's statement made during February 4, 2008, earnings call, Plaintiffs provide the Court with the following information:

    Defendant Irving also provided the following full year guidance: revenues of $151
    to $160 million, *gross margins of 56%-58%, non-GAAP operating margins of*
    *31%-33%, and GAAP diluted earnings per share of $0.92-$1.01.*

Compl. ¶ 58 (emphasis supplied).

    The term "gross margin" (<u>i.e.</u>, "gross profit margin") implies the entity's gross revenue, minus the sum of direct-fixed and direct-variable costs (that is, the costs associated with production and sales). The accounting formula reflecting the same typically reads as "Revenue =

assert that these figures were provided by Defendants regardless of Defendants' knowledge that these projections would be unattainable because of the negative impact the practice of "unlocking" might have been destined to cause to Synchronoss' revenue.[24]  See Dismissal Opp., at 7-8.

2.  On the same day, that is, on February 4, 2008, Syncronoss also issued a press release in which, according to the Complaint: (a) "Irving stated that 'we are more optimistic about [Synchronoss'] long-term future than at any point in our history'"; while (b) "Waldis [stated] that 'Synchronoss is well positioned to benefit from multiple growth opportunities' and [that he] was 'optimistic about [Synchronoss'] ability to take advantage of those opportunities based on Synchronoss' unique ConvergenceNow.'" Compl. ¶ 55.  Plaintiffs read both of

---

Gross Profit + Costs."  See HORNGREN ET AL., INTRODUCTION TO FINANCIAL ACCOUNTING 160 (9th ed. 2006).  It is self-evident that the issue of gross margin arises, in legal context, only if the defendant misrepresents the costs, which is not the case at bar.  Similarly, Plaintiffs' reference to "operating margin," that is, the ratio of operating income divided by revenue, see KAREN BERMAN ET AL., A MANAGER'S GUIDE TO KNOWING WHAT THE NUMBERS REALLY MEAN 153 (Harv. Bus. Press 2006), is analogously irrelevant to the case at bar, since the operating income of Syncronoss is not in dispute.  In the same vein, the issue of calculating Synchronoss' diluted earnings per share (that is, the ratio of profit divided by average number of common shares outstanding, with the impact of convertible bonds and granted stock options factored in), see HORNGREN, supra at 70, is also of no relevance to the matter at hand.  Finally, the information that Defendants, allegedly, calculated all above-discussed irrelevant accounting and financial data without utilizing the Generally Accepted Accounting Principles ("GAAP") is equally irrelevant, since the fact of such calculations does not lend support to Plaintiffs' claims asserting substantive falsity of Defendants' statements/projections rather than on the non-utilization of GAAP standards.   Simply put, even though it was proper for Irving to provide various accounting and financial data during Synchronoss' earnings calls, it does not mean that this information is relevant to Plaintiffs' claims.

[24] Plaintiffs also assert that these figures were provided by Defendants regardless of Defendants' knowledge of Synchronoss' exclusion from activation of the iPhone 3G.  See Dismissal Opp., at 8.

these statements as Defendants' assertions that "unlocking" was not affecting -- and would not affect -- Synchronoss' accrued and future revenue.[25]  See Dismissal Opp., at 8.

3.    "On February 29, 2008, [Synchronoss] filed its [10-K] Report . . . with the SEC.  [See Compl.] ¶ 59.  The [Report], which was released two-thirds of the way through the first quarter of 2008, did not discuss the materially adverse effect" of unlocking (as to the accrued part of the first quarter of 2008), and did not offer new quarterly or yearly revenue projections factoring in the potential negative impact of "unlocking."[26]  See Dismissal Opp., at 8.

4.    "On May 6, 2008, Synchronoss issued a press release . . . reporting its results for the first quarter [of] 2008.  In that press release, [Synchronoss] announced that it had materially lowered its growth expectations in 2008 due to reduced revenues associated with the iPhone.  [In addition, Synchronoss] reported net revenue of $29.1 million for the first quarter of 2008, missing its projection of $30[] million [by $0.9 million, that is, by 3%]."[27]  Compl. ¶ 63.  Synchronoss also revised its projections for the entire 2008, lowering them from $151-$160 million to $115-120 million.  Id. ¶ 63.  Plaintiffs read this press release as Defendants'

---

[25]  Plaintiffs also read these statements as Defendants' assertions that ConvergenceNow would necessarily be utilized by Apple/AT&T for the purposes of off-site activation of the iPhone 3G.  See Dismissal Opp., at 8.

[26]  In addition, Plaintiffs assert that the Report failed to reflect Defendants' knowledge that Synchronoss' services would not be used by Apple/AT&T for the purposes of the iPhone 3G.  See Dismissal Opp., at 8.

[27]  The Court notes that Plaintiffs' usage of the term "*net* revenue" (which, in accounting parlance, typically means post-cost-deduction-but-pre-tax profit) does not reflect the statements made by Defendants, who referred to Synchronoss' pre-cost-deduction gross revenue, utilizing the terminology used during their February 4, 2008, earnings call.  See Dismissal Mot, Ex. 9.

statement verifying that Defendants knew that the practice of "unlocking" was negatively

affecting Synchronoss' revenue long before May 6, 2008.  See Dismissal Opp., at 8-9.

5.       On the same day, that is, on May 6, 2009, Defendants had another earnings call.  During that

call, Waldis, in response to an analyst's question "[A]re you basing your expectations for the

year on a run-rate basis from where you are right now or with further degradation of

activation rates from where you are now given the trending?" stated:

> Well, we certainly think of -- as I said earlier, we definitely see ourselves at
> an at least 10 million annual run-rate exiting the year as it relates to the
> iPhone. . . . *Obviously, getting the surprise in January and February*, we
> looked at it and wanted to make sure that as far as forecasting going forward,
> that we accounted for it, maybe conservatively.  If it ends up being better, that
> would be great. But . . . we'll at least end with a $10 million run-rate at the
> end of the year.

Compl. ¶ 66 (emphasis supplied by Plaintiffs); Dismissal Mot., Ex. 9.  Same as with regard

to Defendants' May 6, 2009, press release, Plaintiffs read Waldis' phrase "getting the surprise

in January and February" as an indication that Defendants knew about the effect the practice

of "unlocking" was taking on Synchronoss' revenue in January and February of 2008, and

deduce from the foregoing that Defendants' projections stated during February 4, 2008

earnings call (and repeated in Synchronoss' February 4, 2008, press release), as well as

Defendants' figures provided in the February 29, 2008, Report, were false due to Defendants'

failure to take into account the negative effect of "unlocking."  See Dismissal Opp., at 9.

6.       Finally, Plaintiffs also make a reference to Synchronoss' press release of October 25, 2007.

Plaintiffs point out that, during the above-discussed May 6, 2008, earnings call, Irving, in

response to an analyst's question, "Can you confirm that you will continue processing iPhone

transactions later in this year and that the guide down is strictly related to the number of

phones being unlocked and the reduced pricing arrangement around that?" responded with, "I think the best way to answer that . . . is that I've tried to provide as much information as I could without violating any [non-disclosure agreements ("NDAs")] that [Synchronoss has] with [Apple and/or AT&T]." Compl. ¶ 67.  Plaintiffs, however, note that Synchronoss' press release of October 25, 2007, did state the cumulative number of iPhones activated by that date via ConvergenceNow (which, Plaintiffs guess, might have been a violation of the very same NDAs to which Irving referred on May 6, 2008).  See id. ¶ 37.  Consequently, Plaintiffs compare Synchronoss' October 25, 2007, disclosure of the cumulative number of activated iPhones with the statement made by Irving during the May 6, 2008, earnings call and conclude as follows:

> [A]fter the third quarter 2007 earnings announcement, Synchronoss changed its practice and stopped disclosing to investors how many iPhones it had activated in any period notwithstanding its prior practice of doing so.  Indeed, despite the importance of the iPhone contract as a whole, Synchronoss did not separately disclose its revenue from that or any other contract. Rather, citing non-disclosure agreements with its customers, Synchronoss informed investors only of its total revenue from operations for each quarter. Therefore, at no point during the Class Period were investors able to determine for themselves the number of iPhones that were being activated versus those that were being unlocked.[28]

---

[28] Plaintiffs' logic is not entirely clear to this Court for a number of reasons.  First, even if Defendants were originally announcing – but then dropped the practice of announcing – the cumulative number of all iPhones Synchronoss activated since Apple/AT&T began utilizing ConvergenceNow, an announcement of cumulative number of activated iPhones is in not exactly equal to an announcement of revenue derived from such activations during a particular reporting period.  Second, even if the per-period revenue from Synchronoss' iPhone activations were disclosed by Synchronoss (or could be deduced by investors from the cumulative number of activated iPhones through the use of a certain financial formula, which this Court cannot imagine in light of the fact that the per-activation compensation received by Synchronoss for off-site activation of the initial batches of the iPhone differed from the per-activation compensation received with regard to the later batches of the iPhone), such disclosure/deducement would be of little use for the purposes of detecting how many iPhones were sold by Apple but "unlocked,"

Compl. ¶ 43; accord Dismissal Opp., at 7.

      **c.**     ***Plaintiffs' Additional Contentions and Legal Claims***

Plaintiffs also assert that

> [Waldis and Irving] were . . . motivated to engage in the fraudulent scheme in order . . . to sell their personally held Synchronoss common stock . . . at artificially inflated prices while they [knew that the practice of "unlocking" was taking a toll on Synchronoss' revenue].  The following chart sets forth the [stock sales] by [Waldis and Irving] during the [C]lass [P]eriod:

|  | [Waldis:] | [Irving:] |
|---|---|---|
| [May 2008 --] | 6,000 [shares] | . . . 3,080 [shares] |
| [April 2008 --] | 54,000 [shares] | . . . 6,160 [shares] |
| [March 2008 --] | 12,000 [shares] | . . . 3,080 [shares] |
| [February 2008 --] | 12,000 [shares] | . . . 1,100 [shares] |
| Total: | 84,300 [shares] | . . . 13,420 [shares] |

Compl. ¶ 83.

    Basing their legal claims on these figures (and, obviously, on all other allegations discussed supra), Plaintiffs claim that Defendants' actions amounted to violations of Section 10(b) of the Exchange Act and of Rule 10b-5.  See id. ¶¶ 98-109.  Plaintiffs also claim that, in light of the foregoing, Waldis and Irving – being top executive officers and, thus, in control of Synchronoss – violated Section 20(a) of the Exchange Act.  See id. ¶¶ 110-13.

    Finally, Plaintiffs maintain as follows:

> The statutory safe harbor provided for forward-looking statements . . . does not apply to any of the . . . statements [made by Defendants since] many of the[se] . . . statements . . . were not identified as "forward-looking statements" when made. [Moreover,] to the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause

---

since the drop in revenue from off-site activations might be wholly unrelated to the process of "unlocking," e.g., it might be reflective of the tendency of later (less "high-techy" and merely "business-prestige" driven) purchasers to activate their iPhones in stores, right upon the purchase.

actual results to differ materially from those in the purportedly forward-looking statements.     Alternatively,  .  .  .  , [D]efendants are liable for [their] false forward-looking statements because[,] at the time [these] statements [were] made, the . . . speaker[s] knew that [their] forward-looking statement[s were] false . . . .

Id. ¶ 96.[29]

## 2.    Defendants' Position

Defendants maintain that Plaintiffs' claims should be dismissed on various grounds.  See, generally, Dismissal Mot., Dismissal Reply.   First, addressing Plaintiffs' claims related to Defendants' forward-looking statements, Defendants point out that these forward-looking statements were: (a) accompanied by sufficient cautionary language, which immunizes the speaker from liability regardless of the speaker's state of mind, see Dismissal Mot., at 14-20; Dismissal Reply, at 4-9; and (b) in any event, the statements at issue were made by Defendants without the requisite state of mind.

---

[29]   In light of substantial conflation of Plaintiffs' assertions, the Court finds it helpful to depict the groups of Plaintiffs' claims, as the Court could discern them, in the following diagram:



See Dismissal Mot., at 20-34; Dismissal Reply, at 9-18.  In addition, Defendants argue that Plaintiffs' other group of claims -- namely, the group of claims asserting that Defendants' statements were misleadingly incomplete -- should also be dismissed on the grounds of: (a) being insufficiently pled; and (b) allegedly existing Synchronoss' NDAs with Apple/AT&T that, Defendants believe, legally prevented Synchronoss from disclosure of certain information.  See Dismissal Mot., at 34-43; Dismissal Reply, at 18-28.  Finally, Defendants point out that Plaintiffs "fail[ed] to allege that any other statement made by Defendants was false, let alone knowingly false."  See Dismissal Mot., at 43-45; Dismissal Reply, at 28-29.  In light of the foregoing, Defendants conclude Synchronoss committed no violations of Section 10(b) and/or Rule 10b-5 and, consequently, Waldis and/or Inving's have no personal liability under Section 20(a).  See Dismissal Mot., at 45; Dismissal Reply, at 29.

Defendants' submissions arrived accompanied by numerous exhibits and appendices, replicating a multitude of Synchronoss' filings made with the Securities and Exchange Commission ("SEC"), transcripts of those Synchronoss' earnings calls, excerpts which were pled in the Complaint, and various newspaper articles and reports of financial analysts (arriving to conclusions qualitatively different from, if not outright opposite to, the conclusions asserted in the Complaint as opinions of "journalists, analysts and investors").[30]  See, generally, Docket Entries Nos. 24 and 30.  However, Defendants' alleged NDAs with Apple/AT&T were neither included in these appendices nor sought to be filed, even under seal.  See, generally, id.  It appears that Defendants' reliance on these allegedly existing but thus-far undisclosed NDAs was the reason for Plaintiffs' Strike Motion.

_____

[30]  Plaintiffs' Opposition arrived accompanied by five exhibits that include an exchange of letters between the SEC and Waldis.  See Docket Entry No. 25.

### B.    <u>Strike Motion</u>

Specifically, on June 5, 2009, Plaintiffs filed -- jointly with their Opposition to Defendants' Dismissal Motion -- Plaintiffs' Strike Motion requesting the Court to strike Defendants' arguments based on these NDAs.  <u>See</u> Docket Entry No. 27.  That filing caused Defendants to submit -- together with their Reply to Plaintiffs' Dismissal Opposition -- Defendants' Strike Opposition, <u>see</u> Docket Entry No. 31, which – in turn – caused the filing of Plaintiffs' Strike Reply.  <u>See</u> Docket Entry No. 32.

In a nutshell, Plaintiffs moving and reply points can be summarized as follows:

1.    Defendants' Dismissal Opposition frequently asserts, as either an established – or, at the very least, as a pled fact -- that Defendants were prevented from disclosing certain statistical information about iPhone sales (as well as about Synchronoss' future plans) by these thus-far undisclosed NDAs, <u>see</u> Strike Mot., at 1;

2.    However, the legal binds ensuing from these NDAs cannot be judicially noticed since the content of these NDAs was never disclosed publically (or even to Plaintiff only, e.g., by filing under seal), <u>see id.</u> at 2, 5; and even if Defendants' Dismissal Motion is converted into a motion for summary judgment, Plaintiffs would still be entitled to discovery with respect to these NDAs, <u>see id.</u> at 2-3, 5-6; and

3.    Since the content of these NDAs is neither an integral part of Plaintiffs' factual assertions nor subject to judicial notice, nor is it amenable to a summary ruling prior to Plaintiffs' completion of relevant discovery, Defendants' arguments suggesting that Defendants could not be liable for failure to make certain disclosures because of these NDAs should be striken from Defendants' Rule 12(b) Motion to Dismiss.  <u>See id.</u>  at 2-4, 6; <u>accord</u> Strike Opp.

Defendants, in response, maintain that Plaintiffs' Strike Motion is without merit for the following reasons:

1.  Instead of requesting the Court to strike any particular exhibit attached to or relied upon by Defendants, Plaintiffs move this Court to strike Defendants' argument, i.e., to strike nothing but "words",[31] see Strike Opp., at 1;

2.  Defendants believe that this Court should accept Defendants' factual assertion as true because the pleading requirements prevent the Court from considering Plaintiffs' self-serving conclusory allegations,[32] see id. at 3-6, 10-12;

---

[31]  While the merits of the parties' positions as to the Strike Motion are discussed in the next section of this Opinion, this Court notes that it is not clear as to what aspect of Defendants' Dismissal Motion -- other than the the very position taken by Defendants -- Plaintiffs could possibly seek to strike with regard to these wholly undisclosed NDAs.  Simply put, it appears to this Court that Plaintiffs had nothing else to challenge but Defendants' words because Defendants' NDAs-related "exhibits" consisted of nothing but Defendants' verbal assertions.

[32]  The logic of Defendants' argument escapes this Court.  At best, it appears that Defendants: (a) first read *their own factual assertions* as if they were Plaintiffs' claims stated in the Complaint; (b) then read *Plaintiffs' challenges* to Defendants' so re-qualified assertions as conclusory factual allegations; and (c) finally, request the Court to dismiss Plaintiffs' so-re-qualified challenges under the standard that would apply had these challenges were actually stated in the Complaint.  The final leg of this triangulated transformation seems to make the least sense, since – had Plaintiffs actually asserted Defendants' argument as Plaintiffs' fact, it would be in Defendants' own interest not to disturb such assertion, since this assertion would effectively plead Plaintiffs out of court.  However, Defendants' above-described triangulated transformation cannot convert Plaintiffs' challenges into a fact actually stated in the Complaint.  Consequently, Plaintiffs' challenges cannot, in any way, implicate the pleading requirement.  Moreover, the Court notes in passing that, even if Defendants somehow succeeded at converting their own factual allegations into the statements made in the Complaint, Defendants' factless self-serving conclusions (namely, that the NDAs prevented Defendants from disclosure(s) and, hence, insulated them from legal liability) would have to be dismissed under the very pleading requirements invoked by Defendants in hope of striking Plaintiffs' challenges to these allegations.

3.     Defendants' arguments based on the NDAs are warranted because Plaintiffs used certain language in their Complaint that included references to these NDAs, specifically, when Plaintiffs made the following allegations:

> [O]n October 25, 2007, . . . Waldis . . . , when asked about the gap between iPhones sold and activated, . . . stated that he was prevented from sharing specifics "due to NDA obligations" . . . . [Also, during] the May 6, 2008 call, . . . Waldis stated: . . . "[W]e cannot share the specifics due to NDA obligations . . . . We're not allowed to discuss any of the details [relevant to] the NDA . . . ." [In addition, Irving stated during that call:] "I've tried to provide as much information as I could without violating any NDAs that we have with our customer" . . .

Strike Opp., at 6-7 (quoting Compl. ¶¶ 37, 65-67);

4.     Defendants believe that the Court can take judicial notice of -- apparently -- both the existence of these NDAs and the scope/application of these NDAs (seemingly, as the scope/application of these NDAs is defined by Defendants) simply because: (a) as a general matter, "courts can [take] judicial notice of information that was publicly available to reasonable investors"; and (b) Defendants repeatedly and publically made references to their alleged NDAs when Defendants made public statements; Strike Opp., at 9-10; and

5.     Plaintiffs' request for conversion of the Dismissal Motion into a motion for summary judgment (with ensuing Plaintiffs' discovery rights) is without merit.

See id. at 12-15.

## IV.   **DISCUSSION**

### A.   **Strike Motion**

The Court will address the parties' contentions in conjunction with discussion of the pertinent Rules of Evidence and Rules of Civil Procedure.

### 1.      Evidentiary Aspects

Both at common law and under the Federal Rules, most proof is presented by means of testimonial evidence or by the offering documentary evidence.

But there is an exception to the requirement that a party who relies on a certain proposition must prove it; judicial notice.  Rule 201 of the Federal Rules of Evidence governs judicial notice,[33] providing that facts noticed may not be subject to reasonable dispute and specifying certain procedural requirements that must be followed.

> Rule 201(b) . . . permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either[:] (1) generally known within the territorial jurisdiction of the trial court[;] or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b).

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (finding that judicial notice could be properly taken with respect to "three different categories of *documents* [which] included: (1) documents relied upon in the Complaint ([including the defendant's] press releases); (2) documents filed [by the defendant] with the SEC; and (3) stock price data compiled by [a reliable financial news service") (emphasis supplied); accord Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of public *records* and of '*admissions in pleadings* and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action' without converting the motion into one for summary judgment") (emphasis supplied, quoting Harris v. New York State

---

[33]   There are two kinds of judicial notice: (1) judicial notice of legislative facts, and (2) judicial notice of adjudicative facts.  This distinction is followed in Rule 201, which covers the latter but not the former.  However, the claims at hand do not seem to implicate judicial notice of legislative facts.

Dep't of Health, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002), and citing Munno v. Town of

Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)).[34]

Conversely, judicial notice is improper if a legitimate question exists as to the underlying

source of the information.  See Hinton v. Dep't of Justice, 844 F.2d 126 (3d Cir. 1988); see also

Oneida Indian Nation of New York v. State of N.Y., 691 F.2d 1070 (2d Cir. 1982).  Thus, while

matters of which judicial notice may be taken include facts capable of immediate and certain

verification by resort to sources whose accuracy is beyond dispute, accord Dashiell v. Meeks, 396

Md. 149, 174-75 (2006), accurate records or other sources of a judicially-noticed fact must

necessarily exist and be known to the court to enable even the very consideration of whether the fact

is amenable to judicial notice.  Cf. State v. Green, 890 So. 2d 1283 (Fla. Dist. Ct. App. 2d Dist.

2005).  The rationale of this proposition appears self-evident: the principle of judicial notice

obligates the court to -- at the very least -- identify the source with absolute certainty; otherwise, the

ability of a party to dispute this source is frustrated, and an appellate court cannot meaningfully

review the lower court's decision to resort to a source whose accuracy (or even very existence)

cannot reasonably be established.[35]  See United States v. Boyd, 289 F.3d 1254 (10th Cir. 2002) ("we

---

[34] In addition, since the court may take judicial notice of a fact "capable of accurate and ready determination by resort to sources [whose] accuracy cannot reasonably be questioned," Rule 201(b), the court "'may take judicial notice of records and reports of administrative bodies,' such as notices and opinion letters."  Wible v. Aetna Life Ins. Co., 375 F. Supp.2d 956, 965 (C.D. Cal. 2005) (taking judicial notice of a notice and opinion letter issued by the Department of Justice and citing, inter alia, Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir. 1953));  see also Toth v. Automobile Club of California Long Term Disability Plan, 2005 U.S. Dist. LEXIS 40746 (C.D. Cal. 2005) (same).

[35] Indeed, the underlying facts in a judicial record are not necessarily beyond dispute. See e.g., Taylor v. Charter Medical Corp., 162 F.3d 827 (5th Cir. 1998) (the court cannot take judicial notice of defendant's status as a state actor); General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074 (7th Cir. 1997) (trial court erred in taking judicial notice of a

are mindful that if a court takes judicial notice of a fact whose application is in dispute, the court removes the weapons of rebuttal evidence, cross-examination and argument from the parties and raises doubt as to whether the parties received a fair hearing. The effect of taking judicial notice is to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed"); see also State v. Gagnon, 155 N.H. 418 (2007).

Hence, while the statements made by Synchronoss in its filings made with the SEC are properly subject to judicial notice, the opinions of analysts or reporters cannot be noticed for the truth of the matter stated therein: only the fact that these opinions were published can be noticed. By the same token, while the statements contained in the Complaint (indicating that Waldis and Irving issued certain written statements and made certain oral utterances) are amenable to judicial notice, Defendants' claims (that their NDAs exist and that the terms of these NDAs both relate to Synchronoss' statements and prevented Defendants from making certain disclosure) cannot be judicially noticed: this is so simply because neither the existence of these NDAs nor their content is verified by the record or admitted by Plaintiffs. Indeed, it would be wholly anomalous for the Court to conclude that Defendants were actually subject to certain legal bonds if the Court has nether any information about the content of these bonds nor can the Court even establish that these bonds existed in actuality.[36]   See, e.g., Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 347 (5th Cir.

_____

finding that a settlement in a prior proceeding was fair, reasonable and adequate). Yet, there is a distinction between the existence of judicial records and the truth of the facts recorded, and while the court may take judicial notice that a pleading was filed and the filing contained certain allegations, the truth of these allegations and findings are not proper subjects of judicial notice.

[36] Defendants' argument is particularly troubling in light of the ensuing inference that the contracting parties (here, Synchronoss and Apple/AT&T) agreed to circumvent the disclosure requirements set forth by the governing statutory and regulatory provisions. Since it is axiomatic that any contract is read in light of the presumption that its terms do not contradict -- but, rather,

1982) ("judicial notice applies [only] to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities").  Simply put, Defendants' verbal claims *about* these NDAs are qualitatively different from actually existing and introduced into the record NDAs.  And, since the fact that a litigant uttered certain audible sounds or put certain words in writing cannot render the *truthfulness of the content* of these utterances/writings amenable to judicial notice, Defendant's substantive position as to Plaintiffs' Strike Motion is without merit.

### 2.    Procedural Aspects

The Federal Rules of Civil Procedure permit an early challenge to the legal sufficiency of the allegations of a claim under both Rule 12(b)(6) and (c).  When a defendant successfully challenges the plaintiff's legal entitlement to the relief demanded, even if all well-pleaded facts are taken in the light most favorable to the plaintiff, Rule 12(b)(6) permits a judgment as a matter of law in favor of the defendant.  As one court put it, "[l]ike a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a paring of viable claims from those doomed by law." Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 567 (D.R.I. 1996).  If any legal requirement of the claim is not plead, the motion should be granted.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., 988 F.2d 1157, 1160 (Fed. Cir. 1993) ("The purpose of [Rule 12(b)] is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus spare litigants the burdens of unnecessary

---

could be harmonized with -- the relevant legal regime (and, if such reconciliation cannot be made, and the illegality cannot be excised from the contract in favor of salvaging the remainder, then the contract is deemed null and void *ab initio*), see, e.g., Pharm. Sales Consulting Corp. v. Accucorp Packaging, Inc., 231 Fed. Appx. 110 (3d Cir. N.J. 2007), Defendants' NDAs with Apple/AT&T, even if these NDAs were actually in existence, could not have *any* effect on Defendants' disclosure obligations ensuing from the applicable provisions of securities law.

pretrial and trial activity").  For example, if a plaintiff seeks to recover on a tort theory but fails to allege that the defendant's actions were the cause of harm, a Rule 12(b)(6) motion is appropriate.

Of greater importance as a true summary adjudication method is a Rule 12(b)(6) motion which challenges the plaintiff's entitlement to relief upon the legal theory pleaded.  For example, a plaintiff seeking recovery under a theory of negligent infliction of emotional distress under circumstances in which the governing law would not recognize the cause of action -- under the facts as they are pled -- may suffer judgment as a matter of law because recovery simply cannot be had as alleged.

Rule 12(c) similarly permits an adjudication based purely on the allegations of the pleadings, be these pleadings either the complaint or the answer.[37]  Indeed, this motion is particularly useful when the answer admits the allegations of the complaint, for example that a debt is owed as claimed, but raises a defense that is insufficient in law.  See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 521-22 (1993) ("A defendant whose answer fails to contest critical averments in the complaint will, on motion, suffer a judgment on the pleadings").

Hence, both Rule 12(b) and Rule 12(c) motions are "summary proceedings" on the merits in the sense that they deal directly with the existence of a meritorious claim or defense.  See Labaton and Sternberg, Using and Protecting Against Rule 12(b)(6) and Rule 9(b) Motions, 4 Practical Litig. 79 (1993); Hamabe, Functions of Rule 12(b)(6) in the Federal Rules of Civil Procedure: A

---

[37]  Rule 12(c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings" filed by either the plaintiff or the defendant.  Fed. R. Civ. P. 12(c).  Essentially, the Rule poses the very same "purely legal question that can be determined at virtually any stage of the federal process -- in the beginning, under Rule 12(b)(6); after the pleadings [on both sides] have been filed, under Rule 12(c); after discovery, under Rule 56; or after the plaintiff has presented [the plaintiff's] case at trial, under Rules 50(a) or 52." Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 170 (4th Cir. 2007).

Categorization Approach, 15 Campbell L. Rev. 119 (1993).  That is why the Court of Appeals stated

that, "[u]nder Rule 12(c), judgment will not be granted unless the movant clearly establishes that no

material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."

Bayer Chems. Corp. v. Albermarle Corp., 171 Fed. Appx. 392, 397 (3d Cir. 2006).

　　　　Here, Defendants' NDAs-related assertions introduced in the Dismissal Motion (i.e.,

assertions that Defendants' refusal to disclose certain information was proper because of the

existence, content and application of the alleged NDAs) are, effectively, assertions of the type that

could only be included, as a defense, in Defendants' answer rather than in their Rule 12(b) motion.

Hence, it is hardly surprising that -- being presented with Defendants' quasi-answer statements

meshed into Defendants' Dismissal Motion -- Plaintiffs mounted a quasi-Rule 12(c) challenge,

although they labeled their application"Motion to Strike."  In light of the foregoing, it appears self-

evident that, at the instant juncture, Plaintiffs' Strike Motion should be dismissed as premature.  If

this matter proceeds past Rule 12(b) dismissal stage, and Defendants' answer raises the alleged

NDAs as a defense, then Plaintiffs can renew their motion under Rule 12(c), or either side can seek

a full or partial summary judgment on the grounds of these NDAs, that is, provided that neither the

existence nor the scope/application of these NDAs is in dispute.

**　　　B.　　Dismissal Motion**

**　　　　　1.　　Pleading Requirements**

　　　　The standard of review under Rule 12(b)(6) is well-settled: the question is whether the

plaintiff should be given an opportunity to offer evidence in support of plaintiff's claims, not whether

the plaintiff will ultimately prevail in a trial on the merits. See Scheuer v. Rhodes, 416 U.S. 232, 236

(1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen.

Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  However, qualitatively different pleading requirements apply to those assertions that are subject to Rule 8 and to those that are examined under Rule 9.

a.     ***Rule 8 Pleadings***

It is long established that a court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint.  See Burlington Coat Fact. Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

Last year, addressing the clarifications as to the litigant's pleading requirement stated by the United States Supreme Court in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Court of Appeals for the Third Circuit provided the district courts with guidance as to what pleadings are sufficient to pass muster under Rule 8.  See Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008).  Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' . . . ." Twombly, 127 S. Ct. at 1964-65 . . . "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Id. at 1966. [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965 & n.3. . . .

Page 37 of  92

Id. at 230-34 (original brackets removed).  This pleading standard was further refined by the United

States Supreme Court in its recent decision Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009):

> [In any civil action, t]he pleading standard . . . demands more than an unadorned
> ["]the-defendant-unlawfully-harmed-me["] accusation. [Twombly, 550 U.S.] at 555
> . . . .  A pleading that offers "labels and conclusions" or "a formulaic recitation of
> the elements of a cause of action will not do." [Id.] at 555.  [Moreover,] the
> plausibility standard . . . asks for more than a sheer possibility that a defendant has
> acted unlawfully.  Id. [Indeed, even w]here a complaint pleads facts that are "merely
> consistent with" a defendant's liability, [the so-alleging complaint still] "stops short
> of [showing] plausibility of 'entitlement to relief.'"  Id. at 557 (brackets omitted). [A
> fortiori,] the tenet that a court must accept as true all of the allegations contained in
> a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the
> elements of a cause of action, supported by mere conclusory statements [,i.e., by]
> legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of
> an unlawful agreement [or] that [defendants] adopted a policy '"because of,' not
> merely 'in spite of,' its adverse effects upon an identifiable group." . . . . [W]e do not
> reject these bald allegations on the ground that they are unrealistic or nonsensical.
> . . .  It is the conclusory nature of [these] allegations . . . that disentitles them to the
> presumption of truth. . . . [Finally,] the question [of sufficiency of] pleadings does
> not turn [on] the discovery process.  Twombly, 550 U.S. at 559 . . . . [The plaintiff]
> is not entitled to discovery [where the complaint alleges any of the elements]
> "generally," [i.e., as] a conclusory allegation [since] Rule 8 does not [allow]
> pleading the bare elements of [the] cause of action [and] affix[ing] the label "general
> allegation" [in hope of developing facts through discovery].

Iqbal, 129 S. Ct. at 1949-54.[38]

The Third Circuit observed that Iqbal provided the "final nail-in-the-coffin" for the "no set

of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[39] which was applied to

---

[38]  The Supreme Court's treatment of deducements as to a defendant's "indirect
involvement" warrants a separate notice.  There, the Supreme Court reversed the trial court and
appellate court's decisions, observing that the plaintiff must plead the facts showing that the
defendants *actually partook* in the wrongful conduct.  See Iqbal, 129 S. Ct. at 1944-48.

[39]  The Conley court held that a district court was permitted to dismiss a complaint for
failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. at
45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to
dismiss so long as it contained a bare recitation of the claim's legal elements.

federal complaints before Twombly.  See Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009).

Since Iqbal, the Third Circuit has required the district courts to conduct, with regard to Rule 8

allegations, a two-part analysis when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  [See Iqbal, 129 S.  Ct. at 1949-50].  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief" [in light of the definition of "plausibility" provided in Iqbal.]  In other words, a complaint must do *more than allege the plaintiff's entitlement to relief*.  A complaint has to "show" such an entitlement with its facts.  See Phillips, 515 F.3d at 234-35.  As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the *mere possibility of misconduct, the complaint has alleged-but it has not 'show*[n]*'-'that the pleader is entitled to relief*.'"  Iqbal, [129 S. Ct. at 1949-50 (emphasis supplied)].  This "plausibility" determination will be "a context-specific task that *requires the reviewing court to draw on its judicial experience and common sense*." Id.

Fowler, 578 F.3d at 210-11 (emphasis supplied).

### b   ***Pleading Under Rule 9 and the Reform Act***

In comparison to Rule 9, Rule 8 – even as interpreted in Iqbal and clarified in Fowler – still

sets forth merely the floor pleading standard, simply because the very language of Rule 9 imposes

a heightened pleading requirement by demanding factual *particularity* with respect to allegations of

fraud.[40]  "This particularity requirement has been rigorously applied in securities fraud cases."

Burlington, 114 F.3d at 1417 (citations omitted).  Consequently, a plaintiff averring securities fraud

claims must specify "'the who, what, when, where, and how: the first paragraph of any newspaper

story.'" Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst &

Young, 901 F.2d 624, 627 (7th Cir. 1990)).

---

[40]  In other words, pleadings that fail to meet the plausibility requirements of Rule 8, as interpreted in Iqbal, would a fortiori fail to meet the pleading requirements of Rule 9.

The Third Circuit clarified:

[a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting Nice Sys., 135 F. Supp. 2d at 577).

In addition to the Rule 9(b) requirements, a plaintiff alleging securities fraud must comply with the heightened pleading requirements of the Reform Act. See 15 U.S.C. § 78u-4(b)(1) and (b)(2). Specifically, § 78u-4(b)(1) of the Reform Act requires the plaintiff to detail the facts indicating the falsity of the challenged statement. See 15 U.S.C. § 78u-4(b)(1) (the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"). Similarly, the Reform Act requires that "the complaint shall, with respect to each act or omission . . . , state with particularity [all] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Consequently, Rule 9 and the Reform Act modified the traditional Rule 12(b)(6) analysis. "'[W]hereas under Rule 12(b)(6), we must assume all factual allegations in the complaint are true . . . under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute,'" even if these assertions meet the Iqbal-defined Rule 8 pleading requirements. Rockefeller Center, 311 F.3d at 224 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)). "The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule

12(b)(6)." Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) (citing Rockefeller Ctr., 311 F.3d at 224, stating that, "unless plaintiffs in securities fraud actions allege facts . . . with the requisite particularity . . . they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis"); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss").  A plaintiff's failure to meet these heightened pleading requirements results in dismissal of the complaint. See Advanta, 180 F.3d at 531.

Two years ago, in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), the Supreme Court elaborated on the issue of what factual allegations satisfy plaintiff's obligation to plead an element subject to these heightened pleading requirements.  The majority opinion stressed that the facts alleged "must be cogent and compelling, thus strong in light of other explanations." Id. at 324. Moreover, the Supreme Court expressly guided that the district court shall dismiss as insufficient those factual allegations "from which an inference [only] *could* be drawn."   Id. (emphasis in original).   The Court of Appeals for the Third Circuit emphasized this requirement. See Winer Family Trust, 503 F.3d 319 (3d Cir. 2007) (collecting relevant decisions by various courts of appeals and citing Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 755 (7th Cir. 2007), for the proposition that a plaintiff's factual pleading must yield, at the very least, an inference as compelling as any competing inference); see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs., 497 F.3d 546, 550 (5th Cir. 2007) (courts must consider both culpable and non-culpable explanations); ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 104 (2d Cir. 2007) (where a plausible non-culpable explanation is more likely than any guilty inference, the court must find that plaintiffs

failed to state a claim); <u>Belizan v. Hershon</u>, 495 F.3d 686, 690 (D.C. Cir.2007) (district court's failure to conduct a comparison of alleged culpable and plausible non-culpable explanation warrants remand).

### 2.    Substantive Law

Section 10(b) proscribes the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).   The ensuing Rule 10b-5, 17 C.F.R. § 240.10b-5, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

While "[t]he private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market," <u>Burlington</u>, 114 F.3d at 1417 (citing <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994)); <u>see also</u> <u>Eckstein v. Balcor Film Investors</u>, 8 F.3d 1121, 1123-24 (7th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1073 (1994), a Rule 10b-5 plaintiff must still: (a) establish that the defendant made a materially false or misleading statement; (2) demonstrate that the defendant acted with scienter; and (3) show that plaintiff's reliance on defendant's misstatement caused injury to the plaintiff.  <u>See</u> <u>Burlington</u>, 114

F.3d at 1417 (citing Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243 (3d Cir. 1989); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir. 1996)).


a.    ***Element Pled Pursuant to Rule 8:  Materiality***

The test of materiality depends not upon the literal truth of statements but upon the ability of reasonable investors to become accurately informed, see McMahan & Co. v. Warehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991); this is sometimes referred to as the mosaic representation thesis.  See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Genentech, Inc. Sec. Litig., 1989 WL 137189 (C.D. Cal. 1989).  Thus, a finding of materiality is based on the total mix of information available, see Ieradi v. Mylan Labs., Inc., 230 F.3d 594 (3d Cir. 2000), and the concept of materiality cannot be distilled into a bright-line test, see Basic Inc. V. Levinson, 485 U.S. 224 (1988), see also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992); Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), short of stating that an alleged misrepresentation cannot be deemed material to an investor if the general public has access to correct information.  See Basic, 485 U.S. at 231-32; Wallace v. Sys. & Computer Tech. Corp., 1997 U.S. Dist. LEXIS 14677, at *42-44 (E.D. Pa. Sept. 22, 1997).

The fact that materiality is determined in context means that a purchaser or seller of securities is not necessarily entitled to all information relating to each of the circumstances surrounding the transaction.  See Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) (deficiencies found by FDA inspectors at one of many business locations were not material); Wilensky v. Digital Equip. Corp.,

903 F. Supp. 173 (D. Mass. 1995), aff'd in part, rev'd in part on other grounds, 82 F.3d 1194 (1st Cir. 1996) (failure to disclose details of new marketing strategy was immaterial); accord Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) (intermediary's conflict of interest is immaterial); Carter-Wallace, Inc. v. Hoyt, 150 F.3d 153 (2d Cir. 1998) (departure from the generally accepted accounting principles cannot qualify as a material element for the purposes of securities fraud action).  It is not sufficient to show that a shareholder might have found the information to be of interest: the plaintiff has to establish the importance of the particular piece of information to a reasonable investor.  See Burlington, 114 F.3d at 1432 ("'[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.' [Management's] possession of material nonpublic information alone does not create a duty to disclose it") (quoting Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), and citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996), and Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987)); Milton v. Van Dorn Co., 961 F.2d 965 (1st Cir. 1992) (where plaintiffs bought the stock of a subsidiary company of the parent corporation and, after the sale was completed, another of the parent corporation's subsidiaries announced plans to begin producing a product that would compete with plaintiffs' product, the court found that nondisclosure of the other subsidiary's production plans was immaterial).

**b.**      ***Elements Pled Pursuant to Rule 9***

While the Reform Act mandates heightened pleading requirements as to the scienter element, loss causation is not one of the § 10(b) elements with respect to which the Reform Act imposes a more stringent pleading requirement.  See In Re Mutual Funds Invest. Litig., 566 F.3d 111, 119-20 (4th Cir. 2009) ("the PSLRA's heightened pleading requirements do not govern our analysis of the

elements of reliance or loss causation"). However, the element of reliance is still subject to Rule 9(b) requirements. See, e.g., id. at 120.

### i.   *Reliance*

The reliance requirement is a corollary of materiality. See Semerenko v. Cendant Corp., 233 F.3d 165, 180 (3d Cir. 2000). As under common law, the reliance requirement applies in securities fraud cases, and reliance is an element of a private claim under Rule 10b-5. See List v. Fashion Park, Inc., 340 F.2d 457, 452 (2d Cir. 1965), cert. denied, 382 U.S. 811, reh'g denied, 382 U.S. 933 (1965). Since proving reliance could be hard in view of the nature of modern securities markets, federal courts fashioned a "fraud-on-the-market" presumption for proving reliance based on the Efficient Capital Market Hypothesis, i.e., the premise that, if the market is efficient, the information disclosed by issuers, issuers' agents and analysts is both available to and swiftly absorbed by the investors. See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992).

The court in Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), appeal dismissed, 993 F.2d 875 (3d Cir. 1993), set out the key terms enabling plaintiff's usage of the fraud on the market theory: (1) an open market, in which anyone, or at least a large number of persons, can buy or sell; (2) a developed market, which has a relatively high level of activity and frequency, and for which trading information is widely available, e.g., a secondary market in outstanding securities which usually has continuity, liquidity and the ability to absorb a reasonable amount of trading with relatively small price changes; (3) an efficient market, which rapidly reflects new information in price; and (4) cumulative effect of these terms, so the developed market is both open and efficient. See Enron Corp. Sec. Derivative & "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146, at *95 (S.D. Tex. June 5, 2006) (relying on Cammer).

Since the New York and American Stock Exchanges are examples of open and developed securities markets, see id., and Synchronoss' common stock is registered with the United States Securities and Exchange Commission and traded on the NASDAQ,[41] the case at bar is subject to both the Efficient Capital Market Hypothesis and  the fraud on the market presumption.

### ii.    *Scienter*

Rule 10b-5 describes the type of conduct proscribed but it does not set out the appropriate standard of culpability.  The Supreme Court held in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), that, in order to establish a valid claim under Rule 10b-5, the plaintiff must prove that the defendant acted with scienter.  The scienter requirement is satisfied by a showing of intentional misrepresentation made with intent to deceive.[42]

---

[41]  The National Association of Securities Dealers Automated Quotations, known as NASDAQ, is the largest electronic equity-securities trading market in the United States

[42]

In addition, the Third Circuit has found that recklessness is sufficient to state a claim under 10b-5, but *only with respect to past and present events* that were falsely presented to the investing community.  See, e.g., Sharp v. Coopers & Lybrand, 649 F.2d 175 (3d Cir. 1981), cert. denied, 455 U.S. 938 (1982); Coleco Indus., Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977), cert. denied, 439 U.S. 830, reh'g denied, 439 U.S. 998 (1978). As the Ninth Circuit explained,

> [R]ecklessness is a lesser form of intent rather than a greater degree of negligence. . . .  Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (1990), cert. denied, 499 U.S. 976 (1991) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert. denied, 434 U.S. 875 (1977)).  To satisfy the recklessness standard in a case alleging non-disclosure, a plaintiff must demonstrate: "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Wilson, 195 F. Supp.2d at 639.

Since scienter is based on the defendant's state of mind and, as such, may be difficult to prove without direct evidence, courts are willing to permit inferences that the defendant acted with the requisite scienter.  See, e.g., Fine v. American Solar King Corp., 919 F.2d 290 (5th Cir. 1990), cert. dismissed, 502 U.S. 976 (1991). However, such inferences are not to be made lightly.  See, e.g., Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ($1.6 million dollar profit from inside trading was not sufficiently unusual to provide an inference of scienter).  The inference may be made only when the fact pattern *unambiguously indicates* that the defendant was acting with the requisite state of mind.  See, e.g., Phillips Petroleum Sec. Litig., 881 F.2d 1236 (defendant's good faith statement of present intent does not become actionable simply because of defendant's change of intent at a later point).  Thus, to withstand the scrutiny imposed by the Reform Act, the inference of scienter must be: (1) reasonable: (2) strong; and (3) based on pleadings stating the pertinent facts with particularity. See 15 U.S.C. § 78u-4(b)(1) and (2) (the plaintiff shall state "the reason . . . why the [challenged] statement [was] misleading, and . . . all facts on which [plaintiff's] belief is formed," as well as "particular[] facts giving rise to a strong inference that the defendant acted with the required state of mind"); Alpharma Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004); The End of the Unbearable Lightness of Pleading: Scienter After *Silicon Graphics*, 48 UCLA L. Rev. 973 (2001) (detailing the development of both elements).

A plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior."  Advanta, 180 F.3d at 534; see also Burlington, 114 F.3d at 1418.  If the plaintiff desires to employ the "motive and opportunity" method, the plaintiff should demonstrate a logical

connection between the alleged fraud and motive in order to establish a reasonable inference of fraud.  See Glickman v. Alexander & Alexander Servs., 1996 U.S. Dist. LEXIS 2325, at *36 (S.D.N.Y. Feb. 27, 1996) ("[There should be a] coherent nexus between the alleged fraudulent conduct and its alleged purpose").  Furthermore, there must be more than conclusory allegations of motive and opportunity; stating that "the defendant must have known" is not legally sufficient.  See, e.g., Mortensen v. AmeriCredit Corp., 123 F. Supp. 2d 1018 (N.D. Tex. 2000); Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194  (S.D.N.Y. 1999).  A "strong inference" may arise only if the complaint sufficiently alleges that the defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor."[43] Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000); see Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002) ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures. . . . [M]otive and opportunity 'like all other allegations of scienter must now be supported by facts stated with particularity and must give rise to a strong inference of scienter'") (quoting Advanta, 180 F.3d at 535); Cybershop.com Sec. Litig., 189 F. Supp. 2d 214 (D.N.J. 2002).

---

[43]  With respect to the other method of establishing scienter, that is, by circumstantial evidence of intent, "the strength of the circumstantial allegations must be [even] greater."  Kalnit, 264 F.3d at 142; see Oran v. Stafford, 226 F.3d 275, 288-89 (3d Cir. 2000).  In that situation, the plaintiff must support his allegations by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind.  Burlington, 114 F.3d at 1422 (citing DiLeo, 901 F.2d at 627); see also Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events is insufficient circumstantial evidence).

Under this pleading standard, a plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations common to the aspirations held by law-abiding business community: such goals or practices cannot amount to a valid motive for the purposes of showing scienter.  See GSC Partners CDO Fund, 368 F.3d at 237 ("Motives that are generally possessed by most corporate directors and officers do not suffice") (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (capitalization restored); San Leandro, 75 F.3d at 814 ("[A] company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because such motive could be imputed to any company.  "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (citation omitted); Nice Sys., 135 F. Supp. 2d at 584) ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is . . . insufficient to demonstrate that [d]efendants had a motive to commit fraud"); Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1175 (W.D.Wash. 1998) ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA").

While the aforesaid pleading requirement is quite stringent, the plaintiff in a securities fraud action can support his/her complaint by using information attributed to confidential sources.  See Novak, 216 F.3d at 313-14 (holding that, while the PSLRA "may compel revelation of confidential sources under certain circumstances," there was no per se requirement of disclosure if the plaintiff states sufficient facts to support plaintiff's allegations).  That being said, statements from undisclosed confidential sources can be used in only two situations: (1) if the complaint sets forth other factual

allegations, such as documentary evidence that are nearly sufficient to support a fraud allegation, see id. at 314; see also Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509 (D.N.J. 2005) (finding sufficient corroboration in specific notes, memoranda, emails and presentation materials); Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (if the allegations are contradicted by the documents, the documents control), aff'd, 43 F.3d 1458 (2d Cir. 1994); or (2) when the confidential sources are described in the complaint with such degree of particularity as to support the inference that the confidential source is a person in a position to possess the specific information alleged.  See Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509.

Elaborating on this latter scenario, the Third Circuit explained that the complaint must disclose: (1) the time period during which the confidential source worked at the defendant-company, (2) the particular dates on which the relevant information was acquired, and (3) the facts thoroughly detailing how the source obtained access to the information at issue. See Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 146 (3d Cir. 2004); Freed v. Universal Health Servs., 2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005); Portal Software, Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 20214, at *28 (N.D. Cal. Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable").  Moreover, the Third Circuit held that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail.  See Chubb, 394 F.3d at 146; see also Northpoint Commc'ns Group, Inc., Sec. Litig., 184 F. Supp. 2d 991, 999-1000 (N.D. Cal. 2001); U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); Ramp Networks, Inc., 201 F. Supp. 2d 1051, 1067 (N.D. Cal. 2002).  Failure to meet these requirements with respect to

each confidential source the plaintiff relies upon renders that source irrelevant for the purposes of plaintiff's allegations.  See Chubb, 394 F.3d at 146.  Moreover, "[t]he sheer volume of confidential sources cited cannot compensate for these inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."  Id. at 155; see also Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 391-92 (E.D. Pa. 2005) (finding statements from five meagerly identified confidential sources insufficient).

### iii.    *Forward-looking Statements*

The above-discussed requirement to prove scienter is reflected in Section 21E of the 1934 Act, 15 U.S.C. § 78u-5(c), which provides guidance to corporate managers wishing to issue forward-looking projections without risking legal liability.  To be protected by 15 U.S.C. § 78u-5(c), an issuer (or the issuer's agents) must identify all written or oral forward-looking statements as forward-looking (or couch these statements in such terms that the forward-looking nature of these statements would be self-evident to a reasonable investor),[44] see Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16 (N.D. Cal. 2002) ("[A] prediction about future events is self-evidently a forward-looking statement"), and either: (1) accompany these projections with a sufficient cautionary language; *or* (2) make these projections without actual knowledge that the projections are false or misleading.

---

[44]

"The term 'forward-looking statement' means [inter alia,] a statement containing a projection of revenues, income (including . . . loss), earnings (including . . . loss) per share, capital expenditures, dividends, capital structure, or other financial items; [or] a statement of the plans and objectives of management for future operations, including [those] relating to the products or services of the issuer; [or] a statement of future economic performance [or] results of operations; [or] any statement of the assumptions underlying or relating to any statement described [above.]" 15 U.S.C. § 78u-5(i)(1).

Page 51 of  92

See 15 U.S.C. §§ 78u-5(c)(1)(B)(i) and 78u-5(c)(1)(B)(ii)(II).[45]   The speaker's inclusion of cautionary language in his/her non-scienter-state-of-mind announcement yields a dual isolation of the speaker from liability.

When the plaintiff challenges a forward-looking statement made by the defendant, the plaintiff's mere usage of catchwords or bold assertions that defendant's statement was false or misleading because the defendant knew -- or should have known -- the statement to be false or misleading cannot lend support to plaintiff's claim.  See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false"); Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181 (N.D. Cal. 2000) (conclusory allegations that the corporate officers must have known the falsity were insufficient).  Consequently, plaintiff's failure to plead with specificity the facts showing that defendant's forward-looking statements were made by the defendant with defendant's *actual knowledge* that these statements were false precludes plaintiff's claim, and plaintiff's allegation that the defendant was reckless in defendant's projections is insufficient.[46]  See 15 U.S.C. § 78u-5(c)(1)(B).

---

[45]

The rationale of this rule is self-evident: where an issuer (or the issuer's agent) made a statement without actual knowledge that the statement was false or misleading, the issuer (or its agent) cannot intend to defraud the market and, thus, lacks the requisite scienter. Alternatively, if the issuer (or issuer's agent) has actual knowledge that the issuer's forward-looking statements are false of misleading, but accompanies these forward-looking statements with a meaningful and directly-related cautionary language, the issuer is not liable for the injuries that might ensue from investors' reliance on the false forward-looking statements.  See 15 U.S.C. § 78u-5(c)(1)(A)(I).

[46]  The provision contains no definition of "actual knowledge" for the purposes of forward-looking statements.  Since it is apparent that actual knowledge can exist only in the present or past, and one cannot have actual knowledge of the future, courts have held that a forward-looking statement could be regarded as a representation that the speaker has a present

It shall also be noted that a company's management is not responsible for opinions, projections and estimates of security analysts, even if the management may have supplied the analysts with some of the information they used to formulate their estimates,[47] unless the plaintiff sets forth facts indicating that the management either: (1) retained the services of the analysts; or (2)

---

belief as to the future. See NAHC, Inc. Sec. Litig., 306 F.3d at1330 ("To be actionable, a statement . . . must have been misleading at the time it was made") (citing Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d at 586). "[Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that . . . the public was likely to be misled. [Securities] 'law does not expect clairvoyance.'" IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d Cir. 2002) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)); see also DiLeo, 901 F.2d at 627) ("[P]roffer[ing a] different financial statement [is not sufficient.] Investors must point to some facts suggesting that the difference is attributable to fraud"); Harris v. IVAX Corp., 998 F. Supp. 1449, 1455 (S.D. Fla. 1998) ("Plaintiff['s] attempt simply to hold up the Defendants' predictions against the backdrop of what actually happened" is insufficient to establish scienter), aff'd, 182 F.3d 799 (11th Cir. 1999), reh'g denied en banc, 209 F.3d 1275 (2000). Thus, the plaintiff cannot assert defendant's lack of sincere belief by pointing to the difference between the defendant's projections and the actual outcome. See Chubb, 394 F.3d at 158 (the Third Circuit has "long rejected attempts to plead fraud by hindsight"); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 514 (7th Cir. 1989) ("If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. In either case, the difference may disappoint investors, who can say later that they bought for too much [if the projection was too optimistic,] or sold for too little, [if the projection was too pessimistic]. . . . [T]he firm is not liable despite error"); Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997) ("[I]t is clearly insufficient for plaintiffs to say that the later, sobering revelations made the earlier, cheerier statement a falsehood") (quoting GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994)); Suprema Specialities, Inc. Sec. Litig., 334 F. Supp. 2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim") (citations omitted); Boston Tech. Sec. Litig., 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("A general averment that defendants made a statement knowing at the time what later 'turned out badly' does not suffice") (citation omitted).

[47]
    "[S]ecurities laws require [the company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company.]" Raab v. General Physics Corp., 4 F.3d 286, 288 (4th Cir. 1993).

passed a clear misinformation to the analysts with intention that the analysts would communicate the misinformation to the market.  See V-Mark Software, Sec. Litig., 928 F. Supp. 122 (D. Mass. 1996). In the latter scenario, the complaint must allege "facts showing that a particular defendant both made the statement to the analyst and controlled the content of the [analyst's] report." U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, *48 (E.D. Pa. Aug. 23, 2002) (citing Klein v. Gen. Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999)).  "The complaint must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." Hershfang v. Citicorp, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991).

Finally, "general statements of optimism 'constitute no more than puffery, and [being] understood by reasonable investors as such,'" cannot amount to fraudulent information.  Advanta, 180 F.3d at 538 (quoting Burlington, 114 F.3d at 1428 n.14); see also ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) (holding that "[a] spin on its historical performance, as setting a 'record in revenue,' conferring a 'strong start,' and giving . . . 'market leadership,' is puffery"); cf. San Leandro, 75 F.3d at 811.  Indeed, the Third Circuit expressly clarified that "[c]laims that . . . expressions of hope by corporate managers could dupe the market have been . . . uniformly rejected by the courts." Burlington, 114 F.3d at 1427; see also Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them").  For instance, statements by the defendant that merely express defendant's confidence with respect to future results on the basis of previous successes are not actionable.  See Advanta, 180 F.3d at 538.

### iv.   *Omissions*

Page 54 of 92

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak [since a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."[48]   Chiarella v. United States, 445 U.S. 222, 235 (1980).  As the Third Circuit explained,

> "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); see also Burlington, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information").  Such a duty to disclose may arise when there is [an incident of] insider trading, [or presence of] a statute requiring disclosure, or [there was] an inaccurate, incomplete or misleading disclosure [requiring a corrective statement].  See Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992); Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc); General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1129 (D. Del. 1988).

Oran v. Stafford, 226 F.3d 275, 286-87 (3d Cir. 2000); see also Winer, 503 F.3d at 329.


### c.   *Liability of Controlling Person*

Section 20(a) of the 1934 Act, 15 U.S.C. § 78(a), states that "[e]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person."  15 U.S.C. § 78t(a).  Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws.  See Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005); Digital Island Sec. Litig., 357 F.3d at 337; Shapiro, 964 F.2d at 279.  To establish a prima facie case that the defendant was a controlling person within the meaning of Section 20(a), the plaintiff must show that:

---

[48]   The concept of nondisclosure exists only in the context of past or present statements rather than predictions of the future, since nondisclosure of infinite number of future events that could – but, eventually, would not happen – is not a nondisclosure but lack of the ability to achieve clairvoyance, a capacity not required by the securities law.

(1) the defendant had actual power or influence over the controlled person; and (2) the defendant actually participated in the alleged illegal activity.[49]  See Kersh v. General Council of the Assemblies of God, 804 F.2d 546, 548 (9th Cir. 1986); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d Cir. 1975); MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998); Klein v. Boyd, 949 F. Supp. 280 (E.D. Pa. 1996), aff'd in part, rev's on other grounds, 1998 U.S. App. LEXIS 2004 (3d Cir. Feb. 12, 1998);  Gordon v. Diagnostek, Inc., 812 F. Supp. 57 (E.D. Pa. 1993).

### 3.    Claims Based on Defendants' Forward-Looking Statements

Defendants maintain that they are not liable for the alleged falsity of their forward-looking statements because: (a) each of these statements was accompanied by a sufficient cautionary language; and/or (b) each of these statements was made without scienter.  See generally, Dismissal Mot., at 14-34.  However, while -- as detailed below -- Defendants' position appears factually warranted and legally valid with regard to some of Plaintiffs' challenges, Defendants' arguments are

---

[49]

The group pleading doctrine allowed plaintiffs in securities fraud cases to attribute corporate statements to "one or more individual defendants based solely on their corporate titles." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir. 2004).  The doctrine (alternatively referred to as the "group published" doctrine and the "group published information presumption," see id.; William O. Fisher, Don't Call Me a Securities Law Groupie: The Rise and Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991, 995 n.12 (2001)) favors plaintiffs by making it easier to satisfy Rule 9(b)'s particularity requirement since, under the doctrine, the plaintiffs can name corporate officers as defendants even though the plaintiffs did not know the roles such officers played in an alleged fraud.  The Third, Seventh and Fifth Circuits have held that the PSLRA forecloses the practice of group pleading in securities fraud cases.  See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006); Tyson Foods, Inc. Sec. Litig., 155 Fed. Appx. 53, 57 (3d Cir. 2005); Southland, 365 F.3d at 359-64; Sonus Networks Secs. Litig., 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006); AIG Global Secs. Lending Corp. v. Banc of Am. Sec. LLC, 2006 U.S. Dist. LEXIS 25883 (S.D.N.Y. Apr. 25, 2006); see also Steiner v. MedQuist Inc., 2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006); Cambrex Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 25339 (D.N.J. Oct. 27, 2005); Bio-Technology Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574 (D.N.J. 2005).

factually and legally inapposite to Plaintiffs' challenges based on those occurrences which Plaintiffs elects to qualify as forward-looking statements about Synchronoss' projected involvement in the off-site activation of the iPhone 3G. The Court, therefore, begins its discussion with this line of allegations.

        a.     ***Future Projections Allegedly Related to the iPhone 3G***

It appears that Plaintiffs base this line of allegations on the following occurrences:

a.    Publication of certain unspecified statements made, presumably, by Defendants on unspecified dates prior to the Class Period.[50] Plaintiffs: (i) first deduced from the unspecified language of these unspecified statements that Synchronoss decided to "widely publicize" its 2007 multi-year contract with Apple/AT&T, pursuant to which Synchronoss' ConvergenceNow was utilized to support the launch and ongoing operational of "the Apple iPhone"; and (ii) then deduced from their prior deducement that, since this "wide publication" utilized the phrase "the Apple iPhone," the publication expressed Synchronoss' position that its software would be utilized in off-site activation of either all future models of the iPhone or, at the very least, of the iPhone 3G;

b.    Rise of certain rumors of unspecified content and of equally unspecified origin about upcoming release of the iPhone 3G. Plaintiffs -- as well as certain financial analysts and/or journalists unrelated to Defendants, upon whose opinions Plaintiffs elected to rely -- first deduced from these rumors that the iPhone 3G would necessarily be available for off-site activation, and then deduced from their prior deducement that Synchronoss'

---

[50] It is self-evident that challenges to statements made outside the Class Period cannot be validly made by Plaintiffs. However, in light of the extensive substantive invalidity of Plaintiffs' assertions, the Court sees little reason for discussing this shortcoming.

ConvergenceNow (or some other Synchronoss' software) would necessarily be utilized for such activation of the iPhone 3G;

c.    On February 4, 2008, Waldis stated: "We are extremely pleased with the continued high level performance that our ConvergenceNow [program] has delivered [for the purposes of] activation of the Apple iPhone." Plaintiffs, again, deduced from this statement -- and from Waldis' usage of the phrase "the Apple iPhone" -- that: (i) the iPhone 3G would necessarily be available for off-site activation; and (ii) Synchronoss' software would necessarily be utilized for such activation;

d.    Similarly, when -- on February 4, 2008 -- Irving forecasted Synchronoss first-quarter-of-2008 revenue at $30 to 32 million, and  full revenue for the year 2008 at $151 to $160 million, Plaintiffs, too, deduced from these figures that Irving must have made this financial assessments on the premise that this particular revenue could not be obtained by Synchronoss unless Synchronoss is involved in off-site activation of the iPhone 3G.  Plaintiffs made an identical chain of deducements from Syncronoss' February 29, 2008, Report that repeated the dollar figures uttered by Irving; and

e.    In the same fashion, Plaintiffs deduced from Irving's general statement of optimism ("we are more optimistic about [Synchronoss'] long-term future than at any point in our history") and from Waldis' generic optimistic statement ("Synchronoss is well positioned to benefit from multiple growth opportunities' and [that he] was 'optimistic about [Synchronoss'] ability to take advantage of those opportunities based on Synchronoss' unique ConvergenceNow") the familiar two conclusions, namely, that: (i) the iPhone 3G would necessarily be available for

off-site activation; and (ii) Synchronoss' ConvergenceNow would necessarily be utilized for such activation.

Defendants' position (e.g., that the statements challenged were accompanied by a sufficient cautionary language) cannot be true with regard to, at the very least, the alleged rumors (since Defendants' had no means to inject any cautionary language into someone else's rumors), and the Court has no way to establish the presence of any cautionary language in the unspecified Defendants' statements (where Synchronoss, allegedly, "widely publicize" its multi-year involvement in "the Apple iPhone").  However, neither the issue of the cautionary language nor even that of scienter has any relevance to the occurrences discussed in all the above-listed subparagraphs, (a) to (e), since each and every allegation made by Plaintiffs  fails to point out any *false statement by Defendants*: rather, all these allegations point to *false deducements made by Plaintiffs* and/or by the journalists and analysts upon those whose opinions Plaintiffs elected to rely.   Consequently, Plaintiffs' allegations are facially insufficient.   Accord V-Mark Software, Sec. Litig., 928 F. Supp. 122 (dismissing allegations unless the complaint alleged "facts showing that a particular defendant both made the statement to the analyst and controlled the content of the [analyst's] report"); see also U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, *48.

Moreover, neither the fact of Synchronoss' publicized pride in its contract with Apple/AT&T (even if true), nor Waldis and Irving' pride in -- and/or optimism about -- the performance of ConvergenceNow or Synchronoss' market position and business future, can qualify as a statement falsely indicating that Synchronoss would be involved in activation of the iPhone 3G.  Not only do these statements present immaterial puffery incapable of resulting in legal liability, see Advanta, 180 F.3d at 538 (discussing lack of legal liability for puffery); Parnes, 122 F.3d at 547 (same);

Burlington, 114 F.3d at 1427-28 and n.14 (same); San Leandro, 75 F.3d at 811 (same); ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d at 433 (same), they flatly *lacked any reference to the iPhone 3G*. Similarly, Synchronoss' financial projections relied upon by Plaintiffs were reduced to dollars and cents, and had *not a shred of reference to the iPhone 3G*.  And while it was indeed Plaintiffs' right to tease their fancy and construe any Synchronoss' statement having the phrase "Apple iPhone" as referring to all generations of the iPhone or to the iPhone 3G, or to hypothesize that Synchronoss' financial projections had to factor in the receipts from off-site activation of the iPhone 3G, Plaintiffs do not state any statutory or regulatory provision, or case law (and this Court, on its own, is aware of none) making Defendants liable for Plaintiffs' flights of imagination or for Plaintiffs' self-serving constructions of Defendants' language, or Plaintiffs' overly optimistic hypotheses as to the strategies of Apple/AT&T, or for Plaintiffs' guesswork as to why Irving arrived at the figures stated, just as Plaintiffs do not enlighten this Court about any provision or case law rendering Defendants liable for the tides and ebbs of rumors that allow various unrelated-to-Defendants journalists and analysts to exercise their ability to read the financial crystal ball.  Compare Raab, 4 F.3d at 288 (unambiguously clarifying that the defendant cannot be held liable for statements of unrelated third parties, even if these third parties attribute their opinions to the statements made by the defendant).

　　　　Simply put, Plaintiffs invite this Court to find the Rule 9 / PSLRA degree of falsity in those statements of Defendants that *did not even mention* the alleged object of falsity.  The Court declines the invitation.  Stripped of all niceties, Plaintiffs' assertions as to Defendants' allegedly false projections with regard to Synchronoss' upcoming off-site activation of the iPhone 3G succeed in alleging nothing more than Plaintiffs' bare disappointment with the fact that Plaintiffs' financial hopes (and the projections of the journalists and analysts whom Plaintiffs wanted to believe) turned

out false.  However, the law of securities does not equate the falsity of Plaintiffs' projections (or the falsity of projections made by the press not associated with Defendants) with the falsity of Defendants' projections.   Therefore, Plaintiffs' allegations as to Defendants' allegedly false future projections asserting that Synchronoss would be involved in and get revenue from off-site activation of the iPhone 3G will be dismissed.

### b.   *Future Projections Allegedly Related to "Unlocking"*

#### i.   *"False Failure to Project" as a Cause of Action*

Left unaddressed in the discussion provided above are Plaintiffs' assertions that Defendants are liable to Plaintiffs by "not projecting otherwise," i.e., by not making projections different from the iPhone 3G-related rumors -- or from Plaintiffs' own iPhone 3G-related beliefs -- as to Synchronoss' future.

It appears from the arguments stated in the Complaint and Plaintiffs' Opposition Brief that Plaintiffs are of opinion that a securities defendant might be liable for *failing* to make a certain forward-looking projection.  If so, Plaintiffs err.  As the pages of this Court's extensive discussion of substantive law clarified, a securities defendant -- under certain circumstances -- might be liable for either: (a) the falsity of its statements about the current/past state of affairs; or (b) a failure to correct its prior statements about the current/past state of affairs; or (c) the falsity of *actually made* future projections.  The law of securities, however, does not recognize liability for "false failure to predict": such hybrid cause of action interjecting the liability based on an omission into the liability for false forward-looking statements is simply not cognizable.[51]

---

[51] In other words, one can make a misleading statement as a result of omitting to include certain information for the purposes of discussing current or past events but not for the purposes of predicting the future.  The inherent inability of humans to envision every possible future

Here, however, Plaintiffs' claim exactly that, i.e., that Defendants somehow failed to predict that the iPhone 3G would not be offered for off-site activation and, thus, Synchronoss might not get revenue from Apple/AT&T's launch of the iPhone 3G.  This shortcoming appears even more pronounced in Plaintiffs' claims that Defendants failed to predict -- and, thus, failed to factor in -- the potential negative effect of "unlocking." Unadorned by rhetoric, this claim simply blames Defendants for inability to be clairvoyant about one of the infinite number of scenarios under which Synchronoss would not derive the revenue it was hoping to derive.  However, since it is well established that "[securities] 'law does not expect clairvoyance,'" IKON Office Solutions, Inc., 277 F.3d at 673; see also Denny, 576 F.2d at 470 (same), i.e., the law of securities knows no liability for "false failure to predict," Plaintiffs' claims based on Defendants' inability to predict a potential negative effect of "unlocking" will be dismissed (same as Plaintiffs' claims asserting that Defendants violated the law by not predicting the possibility of Synchronoss' exclusion from activation of the iPhone 3G).

ii.     *Insufficiency of Pleadings*

---

scenario (and, thus, the unavoidable inability to disclose an infinite number of these possible future scenarios) is expressly reflected in the first prong of the safe harbor provision which insulates the speaker from liability if the speaker sufficiently clarifies to the audience the fact that the future invariable holds infinite unknowns and risks.  To that effect, the Court analytically disagrees with Defendants' impression that Plaintiffs' "false failure to disclose" cause of action raises a "sophisticated argument," see Dismissal Reply at 8, as well as with Defendants' reading of Baron v. Smith, 380 F.3d 49, 53-54 (1st Cir. 2004), as a case where the First Circuit acknowledged the existence of such cause of action; rather, this Court reads Baron as the case where the safe harbor was expressly used in order to stress non-liability for the unavoidable non-disclosure of the infinite number of future scenarios that life could bring.

Moreover, even if the Court were to ignore Plaintiffs' reliance on their above-described hybrid "cause of action," Plaintiffs' allegations based on Defendants' alleged failure to predict (and, thus, to factor in) a potential negative effect of "unlocking" would still have to be dismissed.

The threshold shortcoming of this particular claim is that it is facially sophistic, since it asserts a factless premise that the problem of "unlocking" actually was the sole (or predominant) cause for the drop in Synchronoss' revenue in order to: (a) simultaneously – but factlessly – assert that Defendants were able to guess this still-to-be-established negative financial impact of "unlocking," and that Defendants could do it months in advance; and, then (b) to conclude that Defendants either intentionally avoided making such prediction or actually guessed this negative financial impact of "unlocking" correctly but refused to share their guess with the investing public.

However, a multitude of business variables other than the problem of "unlocking" could have affected the revenue Synchronoss was deriving from off-site activations of the iPhone. For instance, the reduction in per-activation compensation (which, as the record demonstrates, came into being after the initial "high-compensation-per-activation" period ended) could very well lead to such decline in revenue, even if the number of Synchronoss' off-site activations of iPhones remained the same or even increased. Or, for example, a swift saturation of the iPhone market (which, according to Plaintiffs' assertions, was promptly tied by two-year contracts and, thus, ceased purchasing new iPhones) and the following slow trickling-in of new iPhone consumers (who, e.g., purchased their iPhones because of the price reduction) could be the reason for an overall decline in iPhone activations and for the ensuing decline in Synchronoss' revenue from off-site share of these activations. Alternatively, the difference in mentality and high-tech propensity between the initial

purchasers and the later purchasers could, just as well, cause a reduction in off-site activations (and upswing of in-store activations), thus yielding a drop in Synchronoss' revenue.[52]

Plaintiffs, however, ask the Court to adopt Plaintiffs' factless conclusion that the decline in Synchronoss' revenue derived from off-site activation of the iPhone was caused solely, or predominantly, by the problem of "unlocking," and expect the Court to find that these factless allegations show that Defendants somehow knew of -- but intentionally omitted to forecast -- this purely hypothetical negative impact.  The Court cannot make this finding, since such holding would be unwarranted even under the more lenient pleading requirements of Rule 8.  See Fowler, 578 F.3d at 210-11 (quoting Iqbal, 129 S. Ct. at 1949-50, and stating that "'[w]here the well-pleaded facts do not permit the court to infer more than the *mere possibility of misconduct, the complaint has alleged-but it has not 'show*[*n*]*'-'that the pleader is entitled to relief*.'  This 'plausibility' determination will be 'a context-specific task that *requires the reviewing court to draw on its judicial experience and common sense*'") (emphasis supplied).  A fortiori, Plaintiffs' allegations cannot pass muster under the heightened pleading requirements posed by the PLRA and Rule 9.  Therefore, this line of Plaintiffs' allegations will be dismissed.

### iii.   *Substantive Insufficiency of the Claim*

Even if this Court would go one step further and -- upon ignoring Plaintiffs' apparent preoccupation with the problem of "unlocking" as the sole/predominant cause for the decline in

---

[52] Needless to say, the cumulative effect of these variables, especially if assessed through the prism of other market variables (e.g., through the prism of the then-developing slump in the United States economy, which was at its "jobless recovery" stage starting from December 2007 and throughout the entire Class Period, meaning that the purchasing power of the United States consumer was either stalled or dropping, negatively affecting demand for luxury goods, such as the iPhone), might be quite substantial, even if each of these variables, individually, could not have a major impact on the number of off-site activations of the iPhone.

Synchronoss' revenue derived from off-site activations of the iPhone – would simply read Plaintiffs' claim as asserting that Defendants' overall financial projections were false, Plaintiffs' claim would, nonetheless, have to be dismissed.

In addition to generic optimistic statements made by Walsis and Irving on February 4, 2008 (which, as this Court already pointed out, constituted nothing but puffery that could not result in legal liability), Defendants issued three sufficiently precise financial statements: (a) one through Irving, during the February 4, 2008, earnings call ("Earnings Call Statement"); (b) another one through the press release ("Press Release") published on the same day; and (c) one by filing their February 29, 2008, 10-K Report ("Report").[53]

Specifically, the Earnings Call Statement forecasted Synchronoss first-quarter-of-2008 revenue at $30 to 32 million, and the same figures were repeated in the Press Release and Report. However, on May 6, 2008, Synchronoss reported net revenue of $29.1 million for the first quarter of 2008, thus missing its low-bar projection of $30 million by $0.9 million, that is, by 3%.[54]

---

[53] Defendants seem to read the Complaint as also asserting the falsity of statements made in Synchronoss' documents filed in 2007.  The Court does not read the Complaint this way since Plaintiffs-selected Class Period started from February 4, 2008, and, thus, any allegations as to the falsity of Defendants' pre-February 4, 2008, statements should be irrelevant (because all Class Period trades by Plaintiffs appear to be made, under the  Efficient Capital Market Hypothesis, in reliance on the superceding information disclosed by Defendants on or after February 4, 2008).

[54] The difference between Syncronoss' 2008 *yearly* projection and its 2008 actual yearly result does not appear to be a litigated issue, since this forward-looking statement was corrected during Synchronoss' May 6, 2008, press release, that projected the figures which Plaintiffs seemingly elected not to litigate, i.e., the Complaint omits any discussion of the correctness of May 6, 2008, yearly projections.  (The Court notes, in passing, its awareness of Defendants' observation that May 6, 2008, projections as to the yearly revenue from the iPhone activations turned out correct and, thus, could not be false by definition.  However, at this stage, the Court is concerned with the content of Plaintiffs' pleadings rather than with Defendants' counter-facts.)

Plaintiffs assert that the Earnings Call Statement, Press Release and Report presented false forward-looking statements. This Court disagrees.

First of all, Plaintiffs fail to allege any facts suggesting "strong inference" of Defendants' scienter. Indeed, the 3% difference between the projected quarterly result and that actually achieved cannot be read as evidencing scienter.[55] See IKON Office Solutions, Inc., 277 F.3d at 673; Denny, 576 F.2d at 470; see also DiLeo, 901 F.2d at 627 ("[P]roffer[ing a] different financial statement [is not sufficient.] Investors must point to some facts suggesting that the difference is attributable to fraud"); Harris v. IVAX Corp, 998 F. Supp. at 1455 ("Plaintiff[']s attempt simply to hold up the Defendants' predictions against the backdrop of what actually happened" is insufficient to establish scienter); accord Chubb, 394 F.3d at 158 (the Third Circuit has "long rejected attempts to plead fraud by hindsight"); Wielgos, 892 F.2d at 514("If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. In either case, the difference may disappoint investors, who can say later that they bought for too much [if the projection was too optimistic,] or sold for too little, [if the projection was too pessimistic]. . . . [T]he firm is not liable despite error"); Grossman, 120 F.3d at 1124 (10th Cir. 1997) ("[I]t is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood").

Similarly, Plaintiffs' assertion that Waldis and Irving profited from sale of their Synchronoss shares provides Plaintiffs' scienter allegations with an insufficient support, especially in light of the facts that: (a) the trades at issue were made pursuant to Waldis and Irving's pre-disclosed trading plans; and (b) it is natural for any trader of securities, including insiders, to try to sell their shares at

---

[55]  Moreover, the $ 900,000 difference between the projected result and the result actually achieved might also be immaterial, granted that it should be compared to the sum of $30 million. The Court, however, does not need to reach the materiality issue in this discussion.

maximum profit.[56]  See Rothman, 220 F.3d 81($1.6 million dollar profit from inside trading was not

sufficiently unusual to provide an inference of scienter); see also GSC Partners CDO Fund, 368 F.3d

at 237 ("Motives that are generally possessed by most corporate directors and officers do not

suffice").  And – since none of the Plaintiffs' facts suggests "strong inference" of Defendants'

scienter with regard to Synchronoss' financial projections -- Defendants' Earnings Call Statement,

Press Release and Report qualify for protection under the safe harbor provision.

---

[56]  The parties' assertions as to Waldis and Irvings' sales of their Synchronoss shares
warrant a brief detour.  Plaintiffs point out that Waldis realized $1,796,594 as a result of his
February-to-May 2008 sales, and Irving realized $289,184 during the same period.  See Compl. ¶
83.  The Court presumes that these dollar figures were provided in order to underscore the
substantiality of the profit made by Waldis and Irving and to suggest that Waldis and Irving had a
scienter-supporting motive to make false projections.  Defendants, on their part, point out that, as
a result of May 2008 drop in price of Synchronoss shares, the value of Synchronoss stock
remaining in possession of Waldis and Irving was reduced by $18.8 million.  The Court
presumes that this dollar figure was provided in order to underscore the substantiality of the
profit that might not be made by Waldis and Irving and to suggest that Waldis and Irving had no
scienter-supporting motive, since -- instead of hiding the truth -- they made the May 6, 2008,
disclosure that opened the possibility of such loss.  The Court, however, is equally unimpressed
by Plaintiffs and Defendants' dollar figures, since both outcomes appear automatically built-in by
the very fact that, upon Synchronoss' public offering, Waldis and Irving retained lion shares of
Synchronoss' common stock and began aggressively selling their stock pursuant to their Rule
10b5-1 trading plans.  Hence, the substantiality of Waldis and Irving's trades (and the ensuing
substantiality of the dollar figures realized as a result of these sales) was built-in by these very
trading plans and by Waldis and Irving's possession of a massive amount of Synchronoss stock.
By the same token, the substantial value depreciation of Waldis and Irving's potential future
trades was equally guaranteed by Waldis and Irving's massive ownership of Synchronoss stock.
In other words, in order to defeat Plaintiffs' point, Waldis and Irving had to practically quit
selling their Synchronoss stock during the Class Period, while -- in order to defeat Defendants'
point -- Waldis and Irwing had to either sell virtually all their Synchronoss stock during the Class
Period or to conceal the truth, indefinitely.  Since all these scenarios appear unrealistic, the Court
finds the information largely irrelevant.  The only peculiarity of Waldis and Irving's trades is the
fact that, in April of 2008, both Waldis and Irving sold notably more shares than during all other
months (i.e., Waldis, whose sales varied from 6,000 to 12,000 shares per month, sold 54,000
shares during April 2008, while Irving -- whose sales varied from 1,100 to 3,080 shares, sold
6,160 shares during the same month).  However, both sides failed to address this peculiarity.

Moreover, even if this Court were to hypothesize that Plaintiffs' somehow omitted to include in their extensive Complaint facts suggesting "strong inference" of Defendants' scienter for the purposes of the claims based on Synchronoss' financial forward-looking statements, Plaintiffs' claims would still have to be dismissed under the first prong of the safe harbor provision insulating Defendants' Earnings Call Statement, Press Release and Report from liability as projections accompanied by sufficient cautionary language.[57]

---

[57]     Specifically, the Earnings Call Statement contained the following language:

> During this call [Defendants] will make statements related to [Defendants']
> business that may be considered forward-looking statements under Federal
> Security laws.  These statements reflect [Defendants'] views only as of today, and
> should not be relied upon as representing our views as of any subsequent date.
> These statements reflect our current views regarding the future, and are subject to
> a variety of risks and uncertainties that could cause actual results to differ
> materially from expectations.  For a discussion on the material risk and other
> important factors that could affect our actual results, please refer to [Defendants']
> SEC filings.

Docket Entry No. 240-12, at 3-4.  The Press Release, similarly,  included risk-alerting language,
stating as follows:

> This document may include certain "forward-looking statements" within the
> meaning of the Private Securities Litigation Reform Act of 1995.  These
> forward-looking statements include, but are not limited to, plans, objectives,
> expectations and intentions and other statements contained in this press release
> that are not historical facts and statements identified by words such as "expects,"
> "anticipates," "intends, "plans," "believes," "seeks," "estimates" or words of
> similar meaning.  These statements are based on our current beliefs or
> expectations and are inherently subject to various risks and uncertainties,
> including those set forth under the caption "Risk Factors" in Synchronoss'
> Registration Statement on Form S-1 and the form of the prospectus contained
> therein, as amended and the Company's Annual Report on Form 10-K for the year
> ended December 31, 2006, as filed with the Securities and Exchange
> Commission.  Actual results may differ materially from these expectations due to
> changes in global political, economic, business, competitive, market and
> regulatory factors.  Synchronoss does not undertake any obligation to update any
> forward-looking statements contained in this document as a result of new

While Plaintiffs concede that all Defendants' financial projections included risk-alerting statements, Plaintiffs nonetheless assert that all these cautionary warnings should not insulate Defendants from liability, since Defendants' cautionary language is, allegedly, insufficient.[58] Specifically, Plaintiffs maintain that: (a) the risk-alerting language was insufficient because it was not expressly warning the investors that it was addressed to forward-looking statements, and because the terminology used was "too boilerplate"; and (b) the incorporated-by-reference risk-alerting language contained in Synchronoss' prior filings dealt with the range of risks which Plaintiffs read

---

information, future events or otherwise.

Docket Entry No. 24-11, at 3.  Finally, Defendants' Report contained extremely detailed cautionary language covering eight pages, single-spaced, reproduction of which appears unfeasible in this Opinion.  See Docket Entry No. 30-3, at 16-23 (providing overall cautions, explanation that the Report was making forward-looking projections, and detailing a multitude of various specific risks).

[58]  Plaintiffs' also assert that the safe harbor provision cannot apply to "forward-looking omissions," i.e., to their self-created hybrid "false failure to project" cause of action.  See Dismissal Opp. at 23.  In support of their conclusion, Plaintiffs quote a sentence from Majesco Sec. Litig., 2006 U.S. Dist. LEXIS 73563, at *13 (D.N.J. Sept. 29, 2006), reading, "courts have held that '[a]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act'" and quoting, in turn, MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 930 (D.N.J. 1998).  In their quotation from Majesco, Plaintiffs italicized the phrase "[not] protected by the safe harbor of the Securities Act," apparently aiming to emphasize the inapplicability of the safe harbor provision to "whatever." See Dismissal Opp. at 23.  Plaintiffs' emphasis is illustrative of Plaintiffs' confusion, since -- this Court believes -- the emphasis in the MobileMedia statement repeated by the Majesco court should be on the phrase "omissions of existing facts or circumstances do not constitute forward looking statements," which would yield the total statement reading: "*omissions of existing facts or circumstances do not constitute forward looking statements* [and, thus, they cannot be] protected by the safe harbor [provision]."  So read, the MobileMedia / Majesco conclusion is identical to that detailed by this Court in the Subsection "'False Failure to Project' as a Cause of Action," supra, i.e., to this Court's explanation that an omission could be made only with respect to an existing fact but not a future projection, and a grave enough omissions of existing facts (i.e., such non-disclosure) would necessarily fall outside the safe harbor protection simply because the safe harbor provision is reserved for forward-looking statements only.

as risks different from the one that Plaintiffs deemed as the risk that actually occurred.[59]  See Dismissal Opp., at 25.

Both Plaintiffs' arguments are invalid.  With regard to Plaintiffs' first argument, the Court agrees with Defendants that Plaintiffs' position is factually unfounded, since the risk-alerting language used in the Earnings Call Statement, Press Release and Report expressly: (a)  notified the investors that Defendants were making forward-looking statements, see note 57 (quoting the relevant language, short of the pages and pages of the cautions included in the Report);[60] and (b) provided the

---

[59]  In addition, Plaintiffs assert that the first prong of the safe harbor provision necessarily operates jointly with, rather than as an alternative to, the second prong of the safe harbor provision.  See Dismissal Opp., at 26 (asserting that a securities defendant making a forward-looking statement could be insulated from liability by the safe harbor provision if the defendant acts without scienter and, in addition, provides the investors with sufficient cautionary language).  As Defendants correctly point out, Plaintiffs misread the safe harbor provision, which offers two independent avenues to the defendant seeking protection of the safe harbor.  See Dismissal Reply at 7 (citing Miller v. Champion Enter. Inc., 346 F.3d 660, 672 (6th Cir. 2003), and Harris v. Ivax Corp., 182 F.3d at 803-04).  Since this point has already been sufficiently established in the subsection titled "Forward-looking Statements," the Court sees little reason for reiterating this legal rule.

[60]  Plaintiffs also maintain that, even if the cautionary language used the phrase "forward-looking statement," the caution had to be insufficient unless each and every Defendants' forward-looking projection was, also, introduced with a separate clarification/reminder that this particular projection was forward-looking.  See Dismissal Opp., at 25.  Plaintiffs err, since "a prediction about future events is self-evidently a forward-looking statement," Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16, and the statute itself (which -- the Court reminds Plaintiffs -- is the law presumed known to all investors, Plaintiffs included) already defined "[t]he term 'forward-looking statement' [as] a statement containing a projection of revenues, income (including . . . loss), earnings (including . . .  loss) per share, capital expenditures, dividends, capital structure, or other financial items; [or] a statement of the plans and objectives of management for future operations, including [those] relating to the products or services of the issuer; [or] a statement of future economic performance [or] results of operations; [or] any statement of the assumptions underlying or relating to any statement described [above.]" 15 U.S.C. § 78u-5(i)(1).  Since Defendants' repetition of what is logically self-evident and already clarified by the statute would be superfluous (or plainly nonessential had Defendants repeated the same before each and every projection), Defendants could not be liable for failing to do what neither law nor logic requires.

audience with not just "boilerplate" discussions but also with incorporated-by-reference extensive

risk discussions made in Synchronoss' other filings made with the SEC.  See Institutional Investors

Group v. Avaya, Inc., 564 F.3d 242, 257 (3d Cir. 2009) (generic cautionary language is sufficient

if it incorporates by reference the risks discussed in the defendant's other filings); In re Merck& Co.,

Inc. Sec. Litig., 432 F.3d 261, 273 n.11 (3d Cir. 2005) (same); In re Party City Sec. Litig., 147 F.

Supp. 2d 282, 309-10 (D.N.J. 2001) (same).

The Court similarly finds Plaintiffs' second argument without merit, although for reasons

different to those advocated by Defendants.  Defendants' maintain that their incorporated-by-

reference risk discussions were necessarily sufficient -- even if the Earnings Call Statement and Press

Release did not specify which particular SEC filings Defendants were referred to -- because all

Syncronoss' filings with the SEC contained extensive discussions of multiple risks, comparable to

pages and pages of such discussion provided in the Report.  See Dismissal Reply, at 6-7.[61] Although

the Court agrees with Defendants' factual and legal points, the Court, however, construes Plaintiffs'

---

[61] Defendants observe that Synchronoss' 2007 10-K report clarified as follows:
"Synchronoss had 'substantial customer concentration,' as AT&T had historically been its largest
customer, noting that it derived 76% of its revenue from AT&T in 2007, as compared to 66% in
2006 . . . .  If one of Synchronoss's significant customers were to decide to manage transactions
internally, rather than use its technology, then that decision could negatively impact its business .
. .  If AT&T turned to 'in- house solutions,' then that development would negatively impact its
business."  Dismissal Reply, at 7.  While the Court agrees with Defendants' factual observations
and with their legal contention that these quoted risks were sufficiently incorporated by reference
when Defendants referred investors to Synchronoss' SEC filings, the quoted language might,
nonetheless, be relevant only to Plaintiffs' allegations related to the iPhone 3G but not to
Plaintiffs' allegations related to the problem of "unlocking," since it appears self-evident that the
problem of "unlocking" could not result from any transition to internal management, or in-house
solution, or in-house technology by any Synchronoss' customer, including Apple and/or AT&T.

challenge as asserting that none of Defendants' filings informed the investors about the possibility that Synchronoss' revenue might drop. See Dismissal Opp., at 25. Such construction allows for:

(a)     a reading of Plaintiffs' challenge to the incorporated-by-reference cautionary language as a challenge based on a "general" decline of Synchronoss' revenue (that is, if this Court employs the presumption stated at the beginning of this subsection, i.e., that Plaintiffs inadvertently focused on "unlocking" as the sole cause for decline in Synchronoss revenue, while Plaintiffs actually wished to assert that Defendants' overall financial projections were false); or

(b)     a reading of Plaintiffs' challenge to the incorporated-by-reference cautionary language as a challenge based on the decline of Synchronoss' revenue solely (or predominantly) as a result of the problem of "unlocking."

Regardless of whether the Court adopts the first or the second reading, Plaintiffs' position is without merit.  In the "general substantial decline" scenario described in paragraph "(a)," supra, Plaintiffs' challenges should be construed as asserting that Defendants "boilerplate" and incorporated-by-reference language did not address the multiple *general* risks, which is factually incorrect.   See, e.g., Docket Entry No. 30-3, at 16-23 (replicating Defendants' Report which extensively details many risks, although not the hypothetical "risk of the problem of unlocking"). Alternatively, in the substantial-decline-only/mainly-as-a-result-unlocking scenario described in paragraph "(b)," Plaintiffs' arguments fail for the reasons detailed by this Court in the subsection titled "Insufficiency of Pleadings," that is, for being both a factless and a sophistic claim. [62]  Thus,

_____

[62]  As the Court already pointed out, Plaintiffs first must show that the problem of "unlocking" -- rather than any other social or economic, or business development, or a cumulative effect of multiple developments -- actually was the cause of the decline in revenue. Plaintiffs, however, do not state a single fact in support of such conclusion short of Plaintiffs' self-serving conjecture.  (Plus, Plaintiffs adopt this premise in order to reach the very same

Plaintiffs' allegations based on the alleged falsity of Defendants' forward-looking statements as to Synchronoss' future revenue fail to state a claim, and will be dismissed.

### 4.    Claims Based on Defendants' Alleged Omissions

As this Court already explained, not every statement containing an "omission," i.e., a statement omitting to disclose information about *current or past* facts, qualifies as a "misleading statement" and entails liability under Rule 10b-5.  See Basic, 485 U.S. at 239 n.17; Winer, 503 F.3d at 329; Burlington, 114 F.3d at 1432.  Rather, the duty to disclose arises only if: (a) a statute requires disclosure; or (b) the omission is accompanied by insider trading; or (c) there is/was an inaccurate, incomplete or misleading disclosure by the defendant.  See Oran, 226 F.3d at 286-87 (citing, inter alia, Glazer, 964 F.2d 149, and General Motors, 694 F. Supp. 1119); Winer, 503 F.3d at 329.

The scenario defined in paragraph "(a)" does not seem to be at issue in this matter, since Plaintiffs do not assert that there was/is an underlying provision expressly mandating Defendants to perform disclosure of the particular facts allegedly concealed, and the Court is not aware of any

---

premise as a conclusion.)  Moreover, even if Plaintiffs succeeded at showing the predominance of "unlocking" as the revenue-dropping factor, Plaintiffs would still have to show that -- as of February 4, 2008 (or as of February 29, 2008) -- Defendants knew about the risk which the problem of "unlocking" posed to Synchronoss' revenue.  Plaintiffs, however, fail to allege any facts in support of their conclusion that Defendants knew of that risk.   In sum, Plaintiffs offer the Court nothing but their conjecture.  However, such conjecture cannot qualify as a valid claim.
 See GSC Partners CDO Fund, 368 F.3d at 239 ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew' . . . or that defendants 'must have known'"); Read-Rite Corp., 115 F. Supp. 2d 1181 (conclusory allegations that the corporate officers must have known [something] are insufficient).

provision so mandating."[63]  Hence, Plaintiffs' claims alleging undue omissions by Defendants must, necessarily, be brought under either "(b)" or "(c)" scenarios.

Speaking of the duty to disclose under the "(b)" scenario, the court in SEC. v Texas Gulf Sulphur Co., 258 F. Supp. 262 (S.D.N.Y. 1966), aff's in part and rev'd in part on other grounds, 401 F.2d 833 (2d Cir. 1968), pointed out that it is obvious that any director, officer, or employee of a corporation might -- and almost certainly will -- know more about his company or have more specialized knowledge as to at least some phase of its business than an outside investor can have or be expected to have.  See id. at 280.  Consequently, a general proposition that all trades by insiders automatically give rise to duty to disclose (or, upon non-disclosure, give rise to a violation of Rule 10b-5) was expressly rejected in Schoenbaum v Firstbrook, 268 F. Supp. 385 (S.D.N.Y. 1967), aff'd 405 F.2d 200, rev'd en banc on other grounds, 405 F.2d 215 (2d Cir. 1968), where the court observed that such a principle would be contrary to both normal business practices and the logic of the Rule's admonition.[64]  See id. at 395.  Rather, a duty to disclose arises when a corporate insider trades on a confidential material information, which is both true and known to the insider, see Glazer, 964 F.2d at 156-57 (citing Backman, 910 F.2d at 12, which -- in turn -- relied on Roeder v. Alpha Indus., Inc., 814 F.2d 22 (1st Cir. 1987), that is, the case where an insider traded on a true and undisputably

---

[63]  For the purposes of 10b-5 liability on the basis of failure to disclose, Rule 10b-5 and the enabling statute *cannot simultaneously serve* as (a) the underlying provisions (that is, as the provisions imposing the duty to disclose) and (b) the provisions imposing liability for violations of this duty: Rule 10b-5 and the enabling statute operate only in the latter capacity, not in the former.

[64]  The Schoenbaum court explained that the fraud involved in buying or selling on the basis of inside information is based first on the user's relationship with the corporation being such as to allow him access to information intended only for a corporate purpose and not for his personal benefit, and secondly upon the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing.

known-to-the-insider information of corporate bribery, since the insider was involved in that very bribery and, eventually, criminally charged), or -- at the very least -- when the insider's trades at issue are so heavily laden with suspicious circumstances that they suggest trades based on an abuse of confidential material information.  See Oran, 226 F.3d at 288-89.

Finally, in the "(c)" scenario, that is, in the situation where the defendant's omission entails liability as a result of the duty to correct/update a prior statement, the court invariably begin their analyses by noting that, at the outset, there is an initial duty on the part of the defendant to state accurate information.  See Roeder, 814 F.2d at 26 (citing Texas Gulf Sulphur, 401 F.2d at 860-61, and Grossman v. Waste Management, Inc., 589 F. Supp. 395, 409 (N.D. Ill. 1984)).   This observation ensues from Rule 10b-5(b)'s prohibition as to the omissions of those material facts, which are  "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  Thus, the defendant cannot make a statement so incomplete as to render the statement, as a whole, misleading.  See Texas Gulf Sulphur, 401 F.2d at 862; see also Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008) (citing Bielski v. Cabletron Sys., 311 F.3d 11, 36  (1st Cir. 2002)).

Then, as the next step, the defendant may also have a duty: (a) to verify/deny rumors about the defendant's operations, but only in the event these rumors were introduced into the marketplace by the defendant or defendant's agents, see General Motors, 694 F. Supp. at 1129 (citing State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 850 (2d Cir. 1981)); or (b) to correct/update its own prior statement, but only if that prior statement was either false when made or was true when made but became misleading (as a result of intervening events) while it still remained operable.  See Overton v. Todman & Co., 478 F.3d 479, 487-88 (2d Cir. N.Y. 2007); Bielski, 311 F.3d 11.

  **a.**  ***Lack of Duty to Disclose Ensuing from Waldis and Irving's Trades***

  Plaintiffs' Complaint does not articulate any facts verifying that Walsis and Irving traded on confidential material information (be it related to the iPhone 3G or to the problem of "unlocking") which is shown to be true and known; rather the Complaint factlessly concludes that such confidential information was in existence and known to Defendants. Consequently, Plaintiffs' argument is facially circular, in the sense that it is first asking the Court to accept Plaintiffs' self-serving conclusions that some events were actually true, and then that these hypothetical events became known to Defendants as confidential information, and motivated their trades. As such, Plaintiffs' argument cannot pass muster even under the more lenient standard of Rule 8, as interpreted in <u>Twombly</u> and <u>Iqbal</u>, and it certainly falls short of the steep pleading requirements set forth by Rule 9 and the PSLRA.

  It follows that Plaintiffs' argument could be based only on facts evincing circumstances so suspicious/anomalous as to suggest that Defendants' trades during the Class Period were made on the basis of confidential material information. Plaintiffs, however, fail to so allege. Indeed, as Defendants duly point out, Plaintiffs do not dispute that Waldis and Irving were trading during the February to May, 2008, period under Defendants' trading plans, and -- under the very same plans -- Defendants were similarly selling their Synchronoss stock prior to and after the Class Period. The sole factual point which this Court could identify offered in support of Plaintiffs' position is Plaintiffs' reference to the exchange of letters between the SEC and Waldis/Synchronoss. However, this reference suffers from both procedural and substantive shortcomings and, consequently, cannot lend support to Plaintiffs' position.

First, as Defendants correctly observe, Plaintiffs' reference to the SEC letter was made in Plaintiffs' Dismissal Opposition, and -- regardless of its merits -- cannot qualify as a pled fact.  See Dismissal Reply at 11-12 (citing Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988), for the proposition "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss") (internal citation omitted).  Second,

> [in] that letter . . . , the SEC had inquired as to why Synchronoss did not include in Synchronoss's [May 6, 2008] Form 10-Q [a statement expressing Defendants' opinion] that the gap between the number of iPhones sold and the number activated by Synchronoss would increase [even though Defendants] contemporaneously disclosed that very same information verbally [during the May 6, 2008,] earnings . . . call.

Dismissal Reply (basing this statement on the content of Plaintiffs' exhibit attached to the Dismissal Opposition, which replicated the SEC letter and was docketed in this matter as Docket Entry No. 26-4).

Since the content of the SEC letter neither details any facts about -- nor even suggests the presence of -- any trading abnormalities by Waldis or Irving, the SEC letter lends no factual support to Plaintiffs' position.  It follows that those allegations which Plaintiffs articulated in their Complaint on the basis of Waldis and/or Irving's trades in Synchronoss common stock must be dismissed.

### b. *Allegations as to Omissions and/or Duty to Correct or Update*

As the foregoing discussion illustrates, Plaintiffs' omission-based allegations cannot be brought on the grounds of either insider trades or the underlying mandate directing disclosure in light of Plaintiffs' failure to assert any fact in support of such contentions, which, in turn, leaves Plaintiffs with only the opportunity to state facts asserting that there was a disclosure by Defendants, which was either so incomplete ab initio as to qualify as misleading or which was not updated in a timely

fashion.[65]  Since both of these options might apply to each of Plaintiffs' two groups of claims (the

iPhone 3G group of claims and the "unlocking" group of claims), and the Court addresses the

resulting alternatives <u>seriatim</u>.

### i.      *Omissions as to the iPhone 3G*

Plaintiffs' "omission"-based group of allegations seems to suggest that, either prior to the

beginning of the Class Period or, perhaps, sometime during the Class Period, Defendants: (a) came

to know, for a fact, that Synchronoss would not be involved in off-site activation of the iPhone 3G;

but (b) either omitted to disclose this fact to the investing public <u>ab initio</u> or failed to update their

prior disclosure when the circumstances changed.  In support of such assertions, Plaintiffs rely on:

(a) the fact that Synchronoss made its announcement as to its non-involvement in the iPhone 3G on

the day following Apple/AT&T's announcement to that effect; and (b) statements of Plaintiffs'

undisclosed witnesses.[66]

---

[65]  It appears self-evident that the duty to correct an omission is subject to the same test as
the duty not to make an omission, since the "duty to correct" scenario refers to the situation when
a correction is issued immediately after the initial disclosure for the reason that the disclosure
was <u>ab initio</u> so incomplete that it rendered the disclosing statement legally misleading.

[66]  Plaintiffs appear to be under the impression that a multitude of allegations, each of
which is insufficient individually, might nonetheless state a sufficient "collective claim" under
the holding of <u>Tellabs</u>.  <u>See</u> Dismissal Opp. at 4 (advocating a "holistic approach to evaluating
scienter").  Plaintiffs err.  If anything, <u>Tellabs</u> stands for a diametrically opposite proposition.
<u>See Tellabs</u>, 551 U.S. at 324 (explaining that all factual allegations "from which an inference
[only] could be drawn" are insufficient).  Moreover, the Third Circuit expressly guided that a
"cumulative" approach to the pleading process is a legal error, since "[t]he sheer volume of
[insufficient allegations] cannot compensate for . . . inadequacies [of individual pleadings].
Cobbling together a litany of inadequate allegations does not render those allegations
particularized in accordance with Rule 9(b) or the PSLRA."  <u>Chubb</u>, 394 F.3d at155; <u>see also</u>
<u>Am. Bus. Fin. Servs.</u>, 413 F. Supp. 2d at 391-92.

As the Court already detailed in the subsection titled "Allegations Related to the iPhone 3G," the statements of Plaintiffs' undisclosed witnesses: (a) allege, as a fact, that, sometimes during the January-to-March of 2008 period, Synchronoss laid off certain permanent employees, some of whom were high-positioned managerial and/or technical staff ("Workforce Fact"); and (b) state an inadmissible quasi-expert opinion ("Quasi-expert Opinion") asserting that (i) Synchronoss would be unable to perform the task of off-site activation of the iPhone 3G without creating a software different from that used for off-site activation of the original iPhone, plus (ii) the task of creating such new software would be virtually insurmountable without the particular employees who were laid off (even with alternative help from temporary or substitute hires).[67]  From the foregoing Workforce Fact and Quasi-expert Opinion, Plaintiffs deduce Defendants' concealment of another

---

[67]  The Court already discussed a few factual shortcomings of the statements made by Plaintiffs' undisclosed witnesses in the subsection titled "Allegations Related to the iPhone 3G." However, certain additional points warrant discussion.  Statements from undisclosed witnesses can be used in two situations: (1) as evidence supplementing other documentary evidence, see Novak, 216 F.3d at 313-14; Royal Dutch, 380 F. Supp. 2d 509; and (2) as evidence self-sufficient to meet the requisite pleading requirement, that is, if the description of undisclosed witnesses and information obtained from them includes the time period that the confidential source worked at the defendant-company, the dates on which the relevant information was acquired, the facts detailing how the source obtained access to the information and specific details regarding the basis for the source's personal knowledge and detailed descriptions of the alleged events.  See, e.g., Chubb, 394 F.3d at 146; Northpoint, 184 F. Supp. 2d at 999-1000; Aggregates, 235 F. Supp. 2d at 1074.  Here, Plaintiffs' reliance of their undisclosed witnesses is: (a) not used as supplementary evidence; and it is also (b) deficient for the purposes of self-sufficient allegations for a number of reasons.  For instance, while Plaintiffs vaguely point out the months during which their undisclosed witnesses were terminated, Plaintiffs do not state when these witnesses began they employ with Synchronoss.  Similarly, Plaintiffs' allegations either do not state the source from which their witnesses obtained the alleged information or plainly suggest that this source was nothing but a rumor.  Moreover, the allegations are wholly silent as to the dates when this alleged information was obtained, etc.  And, as this Court explained in note 20, supra, Plaintiffs' assertions based on the Quasi-expert Opinion are so heavily laden with a multitude of factual incoherences, logical gaps, contradictions with the underlying technical background and claims wholly anomalous in a business setting that these assertions appear facially non-credible.

presumed fact, i.e., that Defendants knew that Synchronoss would not be involved in off-site activation of the iPhone 3G.  In other words, Plaintiffs offer this Court not facts but multiple layers of their self-serving conjecture.

Indeed, the fact that Synchronoss disclosed its non-involvement in off-site activation of the iPhone 3G on the day following Apple/AT&T's announcement in no way indicates that Defendants knew about Apple/AT&T's decision prior to that Apple/AT&T announcement: rather, this fact appears indicative of a scenario where -- until the very day when Apple/AT&T made its final decision and announcement -- Synchronoss was hoping to be involved in off-site activation of the iPhone 3G as a result of the statements from Apple/AT&T that vaguely suggested continuous utilization of Synchronoss' software.[68]  Consequently, Plaintiffs' self-serving conjecture based on the timing of Synchronoss' disclosure cannot qualify as even a plausible claim under Rule 8, as explained in Iqbal, and it certainly cannot meet the pleading requirements of the PSLRA/Rule 9.

Plaintiffs' allegations based on the fact that Synchronoss was laying off personnel during the January-to-March of 2008 period fare even worse, since an infinite number of reasons unrelated to

---

[68]  Plaintiffs invite the Court to find that business relationship between Synchronoss and Apple/AT&T was such that Apple/AT&T were necessarily informing Synchronoss about their strategic plans, including their decision not to offer the iPhone 3G for off-site activation altogether.  However, it is certainly not uncommon for business allies/contracting parties to operate at arms-length and, especially, to conceal their future business plans from those business allies who might be negatively affected by the brewing strategic plans or inclinations.  Moreover, the process of such "concealment of business plans" rarely results in outright refusal to discuss business matters.  More often than not, this process could yield a chain of oblivious "not-exactly-'no'-and-not-exactly-'yes'" statements, allowing for an ongoing hope on the part of the affected business allies until the very day when the negative business/strategic decision is finalized and announced to the general public, as well as to the disappointed-in-their-hopes allies.  Accord Thornton v. Micrografx, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The court refuses to leave its common sense at the courthouse steps [where] plaintiffs have failed to make the requisite showing" and submitted nothing but plaintiffs' self-serving conclusions).

the iPhone 3G (e.g., the undisputed decline in Synchronoss' revenue starting from the beginning of 2008, the overall decline in the nation's economy that resulted in a recession half-a-year later, the tendency of the IT industry, as a whole, to lay off permanent staff in order to outsource work from the United States and/or to employ IT specialists on temporary basis, etc.) or a combination of such reasons could yield an identical result, i.e., the very same reduction in Synchronoss' workforce and/or terminations of permanent staff.  Consequently, the fact of the alleged lay-offs cannot sustain Plaintiffs' claims under the Rule 9 and PSLRA pleading standards.[69]

Granted the foregoing, the Complaint leaves the Court with no relevant factual allegations showing that, either prior to the beginning of the Class Period or sometimes during the Class Period, Defendants knew what they allegedly omitted to disclose.  Yet, Plaintiffs maintain that all Defendants' statements issued during the Class Period were so incomplete that the result of this non-disclosure that Defendants' statements should qualify as misleading.  Attempting to somehow reconcile such Plaintiffs' position with the governing legal regime, the Court presumes that Plaintiffs aimed to assert that Defendants' statements discussing of the original iPhone, being unaccompanied by Defendants' express statements about Synchronoss' hopes (and uncertainties) as to its potential

---

[69] Plaintiffs' allegations are even more anomalous in the event the Court is correct in its impression that Synchronoss' ConvergenceNow was actually utilized by Apple/AT&T in default off-site activation of the iPhone 3G, see note 16, since, in such scenario: (a) Synchronoss did not have to create any additional software and, thus, did not have to dedicate any workforce or other resources to such task; and (b) Synchronoss was not merely led to believe by Apple/AT&T that its ConvergenceNow would be used for off-site activations of the iPhone 3G but had its software actually used Apple/AT&T for such activations.  The only point that Synchronoss would not know in such scenario until Apple/AT&T's disclosure would be that Apple/AT&T elected not to offer the iPhone 3G off-site activation en masse (that is, that such activation was reserved only for the default scenario where the in-store activation fails).

involvement in the iPhone 3G, should qualify as an "omissions" rendering Defendants' statements misleading within the meaning of securities law.

If so, Plaintiffs' allegations fail to state a claim, perhaps because of Plaintiffs' misconstruction of the meaning of the term "misleading." The term "misleading" has an "ascertainable meaning appreciated by ordinary people," United States CFTC v. Reed, 481 F. Supp. 2d 1190, 1199 (D. Colo. 2007), since an expression that a piece of information or a statement is "misleading" indicates nothing more and nothing less than that the statement "tend[s] to mislead, [i.e.,] to lead in a *wrong direction*." See Webster's Third New Int'l Dictionary 1444 (1986) (emphasis supplied). Consequently, it is not enough to allege that the statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement *affirmatively led the plaintiff in a wrong direction* (rather than merely omitted to discuss certain matters). See Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002)) ("Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete. Often, a statement will not mislead even if it is incomplete or does not include all relevant facts"). In Winer, 503 F.3d 319, the Court of Appeals: (a) illustrated this proposition by reminding that "the duty to disclose rule does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so 'incomplete as to mislead," id. at 330 (citation and brackets omitted): (b) clarified that non-disclosure of the defendant's past and future business relationships does not render the defendant's statement so incomplete as to be misleading, see id. at 329-30, accord Backman, 910 F.2d at 16 (failure to discuss details of business operation and operational capacity does not amount to an omission substantial enough to misled); and (c) stressed that the burden of factual assertion

establishing such "misleading type" of incompleteness rests with the plaintiff.  See Winer 503 F.3d at 330; accord 15 U.S.C. § 78u-4(b)(1).

Here, Plaintiffs' Complaint fails to point out a single statement that affirmatively led Plaintiffs in a wrong direction.  The only allegations the Court could locate in the Complaint are: (a) Plaintiffs' systemic discussions of Synchronoss' usage of the term "Apple iPhone" in Synchronoss' statements (without the seemingly-preferred-by-Plaintiffs clarification, "the original version of Apple iPhone only"); and (b) Plaintiffs' observation that Defendants kept expressing pride in Synchronoss' business achievements and successful performance of ConvergenceNow.  However, none of these allegations states facts showing any wrongfulness of Defendants' statements, be these statements examined as a whole or in pieces.[70]  All that Plaintiffs' allegations suggest is the wrongfulness of Plaintiffs' interpretation of the issues wholly unrelated to the content of Defendants' challenged statements.  However, since the meaning of the term "misleading" does not turn on the issues unrelated to Defendants' statements, Plaintiffs' allegations that Defendants' statements were misleading ab initio (and, thus, subject to immediate correction) will be dismissed.[71]  See Burlington,

---

[70]  Indeed, even a scrupulous reader would not be able to find any wrongfulness in Defendants assertions that: (a) Synchronoss had a multi-year contract with Apple/AT&T with regard to the Apple iPhone (since Synchronoss, indeed, had a multi-year contract with regard to the original Apple iPhone); or (b) Synchronoss' ConvergenceNow was successfully utilized in every off-site activation of all iPhones with AT&T that sought to be performed (since this fact appears to be both true and undisputed by Plaintiffs).  Moreover, since it appears equally undisputed that Synchronoss received handsome revenue and favorable exposure as a result of its involvements in the original iPhone, Defendants could reasonably qualify these results as Synchronoss' substantial business achievements and grounds for pride and optimism.

[71]  Plaintiffs' allegations (that Defendants' statements were so incomplete as to qualify as misleading) heavily rely on In re Adams Golf, Inc. Sec Litig., 381 F.3d 267 (3d Cir. 2004), and Shapiro v. UJB Fin. Corp., 964 F.2d 272 (3d Cir. 1992).  However, Defendants' Dismissal Reply sufficiently details Plaintiffs' errors in reading Adams and Shapiro, see Docket Entry No. 30, at 19-20.

114 F.3d at 1432 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. [Management's] possession of material nonpublic information alone does not create a duty to disclose it"); Milton, 961 F.2d 965 (failure to disclose plans by a cluster of corporations to begin producing a product that would negative affect the market for another product being produced by the same cluster of corporations is not a violation of securities law); see also Winer, 503 F.3d 319; Backman, 910 F.2d 10; Brody, 280 F.3d 997.

Plaintiffs' allegations that Defendants violated the law by omitting to update their prior statements through a disclosure contradicting the rumors (which, allegedly, filled the market confabulating that Synchronoss would be involved in off-site activation of the iPhone 3G) similarly fail to state a claim.  This is so simply because the duty to deny or verify rumors could arise only if Defendants themselves affirmatively introduced these rumors into the market, see General Motors, 694 F. Supp. at 1129, but -- here -- Plaintiffs fail to allege any fact so suggesting.  Finally, Plaintiffs fail to assert any facts suggesting that Defendants had a generic duty to update their prior statements when Defendants became allegedly aware about Synchronoss' non-involvement in off-site activation of the iPhone: this is so because none of Defendants statements required such an "update," since none of Defendants' statements -- be it issued prior to or during the Class Period -- even mentioned the iPhone 3G (and, hence, there was no statement to update).  In sum, since the Complaint fails to allege facts showing that Defendants' statements were either misleading when made or that these statements were such that a change in circumstances gave rise to Defendants' duty to update these statements, Plaintiffs' allegations based on Defendants' alleged omissions as to the iPhone 3G issue will be dismissed.

### ii.   *Omissions as to the Change in Synchronoss' Revenue*

The final line of Plaintiffs' allegations deals with the revenue Synchronoss was deriving from its off-site activations of the original iPhone.  As with Plaintiffs' claims based on Defendants' forward-looking statements concerning the original iPhone, the group of challenges at hand could be read through the prism of either: (a) Plaintiffs' seeming preoccupation with the hypothetical predominant impact the process of "unlocking" could have been taking on Synchronoss' revenue; or (b) those few factual assertions that suggest Plaintiffs' more general approach, i.e., the allegations intimating a claim that Defendants misled -- or failed to update -- the investors about the overall decline in the revenue Synchronoss was deriving from the original iPhone.

Read through the prism of Plaintiffs' emphasis on the problem of "unlocking" as the sole/predominant cause for the decline in Synchronoss' revenue, Plaintiffs' allegations fail to state a claim.  The shortcomings of these allegations effectively repeat all Plaintiffs' errors tainting Plaintiffs' challenges based on Defendants' forward-looking statements as to Synchronoss' revenue, and -- in addition -- repeat all the errors made with regard to Plaintiffs' challenges based on Defendants' alleged omissions with regard  to the iPhone 3G.

Specifically, Plaintiffs' allegations start off with Plaintiffs' conjecture that the problem of "unlocking" -- rather than any other problem or a combination of other problems -- was the sole or predominant cause for the decline in Synchronoss' revenue.  After that, Plaintiffs' continue hypothesizing that the problem of "unlocking" was known to Defendant.  As a final step, Plaintiffs assert that Defendants' statements were misleading because Defendants omitted to disclose this hypothetical knowledge to the investors.  These exponentially hypothetical allegations, however, cannot state a claim under the requirements of the PSLRA and Rule 9 -- a legal "adjudication cannot

rest on any such 'house that Jack built' foundation." <u>Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.</u>, 410 U.S. 719, 731 (1973).

In addition -- similar to Plaintiffs' allegations based on alleged Defendants' omissions as to the iPhone 3G -- Plaintiffs' claims (asserting that Defendants' statements as to the original iPhone were misleading either because of Defendants' initial concealment of the problem of "unlocking" or became misleading while operable due to failure to update) fail to point out to any Defendants' statement that could have been leading its audience in a wrong direction or even made any reference to the presence – or absence – of the problem of "unlocking." Consequently, Plaintiffs' allegations based on the decline in Synchronoss' revenue, which focus on the problem of "unlocking," fail to state a claim and will be dismissed accordingly.

The same, however, might not necessarily be true with regard to those Plaintiffs' facts which loosely sketch a vague claim based on the overall decline of revenue Synchronoss was deriving from its off-site activations of the original iPhone. While articulates with the least degree of clarify -- and, perhaps, exactly because of being articulates with such little clarify -- this claim does not appear based on merely exponential layers of Plaintiffs' self-serving conjecture. For instance, Plaintiffs assert two seemingly relevant facts, namely, that: (a) Synchronoss' revenue from off-site activations of the original iPhone declined sometimes in January of 2008, and the same lower iPhone-related revenue continued throughout the first reporting quarter of 2008 (and, apparently, the remainder of the year); and (b) sometimes after the end of February 2008, Defendants digested Synchronoss' financial results for January/February of 2008 and recognized that the lower iPhone-related revenue of January and February 2008 was a sign of a systemic trend rather than a mere "market fluke," and

that this very realization caused Walsis to characterize this trend-setting change as "the surprise [Synchronoss received] in January and February."[72]

It is self-evident that, in the event Defendants knew or should have known about this trend-setting change only on May 5, 2008, Defendants could not commit any violation of securities law, since they issued a statement informing the investing public about the trend on May 6, 2008. Conversely, had Plaintiffs alleged facts ("Duty to Update Facts") showing that the business/accounting operations of Synchronoss were such that Defendants knew or should have known about the financial performance achieved by Synchronoss in January and February of 2008 sometimes prior to May 5, 2008, such allegations might suggest that Defendants violated the law by failing to update still operable prior statements. However, while the Court cannot exclude the possibility that Plaintiffs wished to articulate such Duty to Update Facts, Plaintiffs' convoluted Complaint sets Plaintiffs' facts in such a fashion that the Court cannot discern which facts, if any, were intended to be these Duty to Update Facts. Similarly, the Complaint does not clarify which particular Defendants' prior statements, if any, Plaintiffs deem to be both operable after the end of

---

[72] Since Plaintiffs reiterated Waldis' "surprise"-mentioning phrase for the purposes of virtually every claim Plaintiffs made, without any regard to either the content or the context of Waldis' statement, it does not appear feasible to discuss in this Opinion why Waldis' "surprise" phrase cannot apply to each and every allegation Plaintiffs state in their convoluted Complaint. However, the Court takes this opportunity to note at least the obvious anomaly of Plaintiffs' application of Waldis' "surprise" phrase to Defendants' February 4, 2008, statements. Since February 4, 2008, was a Monday, Plaintiffs' claims based on Defendants' February 4, 2008, statement appear to assert that Synchronoss executives had the "entire Friday" (that is, the entire February 1, 2008) to be both "surprised" about Synchronoss' then-still-upcoming February performance and also to process and report the financial magnitude and the trend-setting significance of this then-still-yet-to-be-discovered "surprise." Because Waldis' "surprise"-mentioning phrase unquestionably reflects Synchronoss' retrospective analysis, it appears self-evident that neither Waldis nor anyone else in Synchronoss could conduct the same analysis prospectively, that is, by the close of business on February 1, 2008.

February 2008 and containing the information that requiring an update about the new trend in revenue.  Furthermore, Plaintiffs fail to specify which particular facts stated in the Complaint might be indicative of Defendants' scienter for the purposes of such failure-to-update claim.[73]  In sum, Plaintiffs' allegations merely "hint" at a claim, rather than state a claim, and shall be dismissed.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005) ("it should not prove burdensome for a plaintiff . . . to provide . . . some indication of the [facts] that the plaintiff has in mind"); accord Kaplan v. United States Office of Thrift Supervision, 104 F.3d 417, 423 (U.S. App. D.C. 1997) (allegations that the defendant should have, somehow, surmised that "something was rotten in the state of Denmark" are insufficient).

C.     **Leave to Amend**

Having thoroughly examined all Plaintiffs' allegations and finding that each of these challenges is not supported by properly pled facts, this Court now turns to the question of whether Plaintiffs shall be allowed to replead their claims.

---

[73]  In addition, if this Court were to read Plaintiffs' allegation as a claim based on Defendants' failure to update their financial statements through disclosure of the decline in the revenue derived from off-site activation of the original iPhone, the basic parameters of such claim would not correspond  to Plaintiffs' assertions set forth in the Complaint.  For instance, Plaintiffs' Class Period would not possibly begin prior to the end of February 2008, and would necessarily end with Defendants' May 6, 2008, disclosure.  Correspondingly, the list of named Plaintiffs might have to be altered, since Plaintiffs must verify to the Court that each of them actually traded their Synchronoss stock during the so-altered Class Period.  See United States Parole Comm'n. v. Geraghty, 445 U.S. 388, 396-97 (1980) (a plaintiff having no personal stake in the ongoing litigation strips the federal court from subject-matter jurisdiction over such plaintiff's suit); Ballentine v. United States, 486 F.3d 806, 810, 48 V.I. 1059 (3d Cir. 2007) (same); see also Spencer v. Kemna, 523 U.S. 1, 7 (1998) ("the plaintiff must have suffered . . . an actual injury traceable to the defendant"); City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983) ("Abstract injury is not enough. [To claim justiciability,] the plaintiff must [assert a] direct injury . . . , not conjectural or hypothetical").

Ordinarily, dismissal based on failure to plead fraud with particularity under Rule 9 is without prejudice to a plaintiff's filing an amended complaint to cure the deficient pleading since, under Federal Rule of Civil Procedure 15(a), the plaintiff may be granted "leave [to amend,] . . . when justice so requires."  See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).   However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'"[74] Chubb, 394 F.3d at 164 (quoting GSC Partners CDO Fund, 368 F.3d at 246); see Cybershop.com Sec. Litig., 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing Champion Enter., Inc., Sec. Litig., 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)).

That being said, the Court is mindful of the Supreme Court's teaching that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits," Foman, 371 U.S. at 180 (citation and internal quotation marks omitted), as well as of the Court of Appeals' strong policy in favor of allowing amendments in order to ensure

---

[74]  For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts hold that a few "bites at the apple is enough," and find it proper to deny leave to replead.  See Salinger v. Projectavision, Inc., 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996); American Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994); and Fisher v. Offerman & Co., Inc., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)).

that claims will be decided on the merits rather than on technicalities.  See Dole v. Arco Chem. Co., 921 F.2d 484, 487 (3d Cir. 1990); Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989).

The Complaint at hand presents the Court with a hard choice.  A forty-one page submission encompassing 113 paragraphs, the Complaint at hand has amended its 29-page 100-paragraph predecessor and represents Plaintiffs' efforts after almost eleven months of litigation.  Yet, short of its least articulated claim challenging, seemingly, Defendants' failure to update some statements by disclosure of a new trend in Synchronoss' revenue derived from activations of the original iPhone, the Complaint provides the Court with a web of claims based not on fact but on exponential layers of Plaintiffs' self-serving conjecture read through erroneous legal standards.  In sum, the content of the Complaint, assessed through the procedural posture of this matter, come dangerously close to indicating "a stark absence of any suggestion [that] plaintiffs [may] develop[] any facts [to] cure the defects [of their] pleadings [to meet] the heightened requirements of the PSLRA."  Chubb, 394 F.3d at 164.

However, weighing the insufficiencies of the pleadings at bar against the possibility that the ambiguities of the Complaint might, nonetheless, be indicative of Plaintiffs' ability to cure the shortcomings of their Complaint, the Court finds it prudent to allow Plaintiffs an opportunity to re-amend their pleadings.[75]  Consequently, Plaintiffs' allegations against Synchronoss will be dismissed

---

[75] In hope to both encourage and facilitate Plaintiffs' thoughtful and discriminating evaluation of their facts, as well as Plaintiffs' drafting of a *well-organized* re-amended complaint which unambiguously states the nature of each claim and then expressly correlates each Plaintiffs' claim to a specific set of facts upon which Plaintiffs rely for the purposes of *this very claim*, the Court will allow Plaintiffs an ample period of time to prepare their re-amended pleadings.

without prejudice.  Plaintiffs' derivative Section 20(a) allegations against Waldis and Irving will be similarly dismissed without prejudice.

## V.      **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion to Strike, Docket Entry No. 27, will be denied, without prejudice, as premature.  Defendants' Motion to Dismiss, Docket Entry No. 24, will be granted, and Plaintiffs' Amended Complaint, Docket Entry No. 22, will be dismissed, without prejudice, for failure to state a claim upon which relief can be granted. This matter will be administratively terminated subject to reopening in the event Plaintiffs timely file their re-amended complaint.

An appropriate Order accompanies this Opinion.

s/Garrett E. Brown, Jr.
**GARRETT E. BROWN, JR.**
**Chief Judge**
**United States District Court**

Dated: April 6, 2010